272 So.2d 625

**Curtis MAGOUIRK**

v.

**STATE.**

7 Div. 138.

Court of Criminal Appeals of Alabama.

Jan. 23, 1973.

James S. Hubbard, Anniston, for appellant.

William J. Baxley, Atty. Gen. and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

PER CURIAM.

Appellant was indicted in Calhoun County, there tried and convicted by a jury of murder in the first degree. The trial court, pursuant to the jury verdict, after proper preliminary proceedings, sentenced defendant to life imprisonment and entered judgment accordingly. Defendant here appeals from this judgment.

The evidence shows without dispute that defendant killed his intended victim, Harold A. Borden, by shooting him at close range with a shotgun. Some of the circumstances leading up to and present at the killing, as reflected by the record before us, are in dispute. The defendant claimed that he acted in self defense. State's witness Tony George, an alleged accomplice present when the fatal shot was fired, testified to circumstances which refuted defendant's claim of self defense. We will later set out in detail some of this testimony which we think is pertinent and essential to this opinion.

The genesis of the alleged crime was at the trailer home of Mrs. Effie Lou Curbow, a middle aged widow with several children. A bar for the illegal sale of alcoholic beverages was set up in her home for the convenience of her customers and guests. What activities of a social nature were carried on is not clear. The environment at least raises suspicion.

A reasonable inference may be drawn from the evidence that the widow was the subject of social attention and admiration of her several male customers and visitors, including Tony George, age 25; defendant, age 22; and the deceased Harold (also called Harry) Borden, about 40 years of age.

The evidence without dispute shows that Tony George and the deceased, Harry Borden, went in search of defendant a short

time before the defendant came to the Curbow trailer home. Defendant's arrival was at approximately 7:30 P.M. on Thursday night, June 10, 1971. Following a reasonable interval of time an argument and scuffle, engendered by ill temperament, ensued between Borden and the defendant. The demonstration was in a measure activated by alcoholic beverages which both participants had consumed. It was probably touched off, as the record indicates, by the admiration of both for the widow. A reasonable inference may be drawn from the evidence that both were competitive candidates for the social admiration and attention of the widow who had acted as their hostess on previous occasions.

After the fracas between the defendant and Borden had subsided, Tony George, the defendant and Borden got in the front seat of Borden's Chevrolet automobile and proceeded to the trailer home of defendant's father some distance away where defendant procured his father's shotgun (with pump operation). The three left in the Chevrolet with defendant driving, Borden in the middle, and George on the outside of the front seat. When they reached an isolated spot on a rural road later in the night, a remark was made which kindled another flare of tempers. Borden reached in the pocket on the dashboard for a knife. George testified that he took the knife from Borden and kept it. Defendant contended that George did not retrieve the knife from Borden.

When the knife came on the scene, defendant stated that he got out and immediately yanked open the back door of the automobile and seized the shotgun where he had put it when he brought it from his father's house. Borden, according to defendant, also reached on the backseat to get the gun. Defendant contended at trial that after he retrieved the gun from the backseat he opened the "turtle shell" (trunk lid) to put the shotgun in the trunk. As he opened the trunk, while standing on the left side, Borden came around the right side of the car along with George. George

was trying to hold Borden's hand. George grabbed the lug wrench from the trunk. Borden, according to defendant, had a knife in his hand as he came around the right side of the car. Borden swung at defendant with the knife. Defendant then stepped back and put a shell in the barrel of the gun. He said it was not loaded before that time. Defendant testified, "I told him not to cut me," and Borden said, "I am going to kill you." He then shot him. At another point in the cross-examination, defendant testified that the shell was already in the gun and was not on his person. Defendant contended that he got the gun to pawn for beer.

Tony George's testimony was at variance in many respects with that of defendant as to the res gestae of the tragedy. Suffice it to say that the jury was empowered to reconcile variances or to say which testimony it believed. The evidence if believed by the jury was ample to support the verdict of guilty under the indictment for murder in the first degree.

The witness Tony George testified that he took the knife from Borden, who did not again have possession of it. George further testified that when the defendant got out of the car and obtained possession of the gun which was lying on the backseat, the defendant told him and Borden to get out. They obeyed. As they went to the rear of the automobile the defendant was standing with the shotgun pointed in the direction of Borden. The defendant then told Borden to get in the trunk. Borden refused to obey. The witness testified that he asked the defendant what he was going to do and he replied, "I am going to kill the son-of-a-bitch." Defendant told the witness to throw both the lug wrench and Borden's knife off to the side of the road. The witness obeyed. He then heard a shot and as he turned around he saw Borden lying on the ground in the road. The defendant had the gun in his hand. The defendant then dragged Borden to the right side of the road.

Thereupon, defendant shut the trunk door and they both got in the car and the defendant drove back to the trailer of his father where he had borrowed the shotgun. The witness obeyed defendant's instructions to proceed to a nearby cabin on the premises and got a cotton quilt. Defendant came to the cabin and both went back to the car carrying the quilt. He testified that he did not see the shotgun when they got back to the car. They immediately returned to the scene of the killing and defendant raised the trunk lid and they put the quilt in the car. They next put Borden's body in the trunk. Defendant held his arms and the witness held his feet in so doing. Defendant then drove the car to the Maqouirk old homeplace. They went to an old well fifteen or twenty feet deep, removed a cross-tie from the opening and dropped Borden's body in the well. They then took the quilt upon which the body had been lying to another area and burned it.

After the burning, they proceeded back to the Curbow trailer. The defendant went inside and remained there fifteen or twenty minutes. The witness George testified that he got in an automobile of defendant's sister at the Curbow trailer and defendant got in the Borden Chevrolet. They proceeded to the home of defendant's sister, Ann Davis, where they remained for ten or fifteen minutes. Early the following morning, June 11, 1971, they were arrested by a city policeman for loitering and imprisoned in jail. There they both remained until the time of defendant's trial. There was considerable evidence about conversations between the two and notes written to each other. Evidence was adduced to reconcile or explain some contradictions occasioned by these notes.

Defendant's counsel at the trial and on this appeal has manifested much diligence, legal aptitude, and resourcefulness in representing his client. He argues that the witness Tony George, whose testimony refuted that of defendant in crucial areas, was an accomplice in the alleged murder

and that his testimony was not corroborated in the manner required by law. Hence, it was inadmissible and should have been excluded. Tit. 15, § 307, Code of Alabama, 1940.

We think there were several areas of George's testimony which were corroborated and met the demands of law. We will refer to some of these areas and omit others.

We first note that Mrs. Effie Lou Curbow, at whose trailer home the involved parties met on the night of June 10, 1971, testified that the defendant told her that on that night he was going to kill Borden. She also testified that later that night the defendant returned to her trailer and told her, "I done what I said I was going to do, I blowed the son-of-a-bitch's head off with a shotgun." This testimony directly connected defendant with the offense for which he was convicted.

George testified as to the defendant's getting a shotgun from his father's trailer home and putting it in the car; also as to defendant's use of the gun in shooting Borden. This testimony was tied in with that of defendant's father who stated that the defendant brought the shotgun back home about 11:30 on the night in question. The sheriff testified that he picked up the shotgun at the home of defendant's father, who gave it to him. The father testified as to giving it to the sheriff. The sheriff testified that he kept the gun and brought it to court where it was introduced in evidence.

Witness George's testimony regarding throwing the body of Borden in the well and removing a cross-tie from the mouth of the well for that purpose was reinforced by the testimony of the officers who found the body in the well and saw that a cross-tie had been removed from the mouth of the well.

George's testimony that he threw the lug wrench away just before the fatal shot was fired was strengthened by the testimony of

an officer who found the lug wrench at the scene of the killing.

George's testimony regarding the burning of the blanket or quilt was supported by the testimony of the sheriff who testified that he and his deputies found what appeared to be "the burned remains of some garment." The discovery was within the area where George testified he and the defendant burned the quilt.

■■■ There is no evidence in the record which we find implicating witness George as an accessory before the fact to the murder. The evidence of defendant does not implicate George. Defendant pivoted his justification solely to his plea of self defense. It may be that George was an accessory after the fact in aiding defendant in removing and concealing the body. Tit. 14, § 15, Recompiled Code, supra. Violation of this section is a separate and distinct offense, made so by this section. Belser v. State, 16 Ala.App. 504, 79 So. 265. The fact that George was indicted with defendant does not per se raise the presumption that he was an accomplice or accessory before the fact. Steel v. State, 37 Ala.App. 621, 73 So.2d 573. The mere presence of George at the scene of the homicide, without more, is insufficient to show him to have been an accomplice to the homicide. Snowden v. State, 27 Ala. App. 14, 165 So. 410; Davis v. State, 257 Ala. 447, 59 So.2d 592.

■■■ We pretermit adjudicating the accessorial status vel non of George but if he was an accomplice as defendant here asserts, we hold that his testimony was corroboratively strengthened by the evidence to which we adverted, supra. Such corroboration justified the admission of George's version of the homicide and the relevant events before and after. Tit. 14, § 15, Code, supra; Smothers v. State, 38 Ala.App. 153, 83 So.2d 374; English v. State, 38 Ala.App. 377, 84 So.2d 673. The corroborative evidence need not be strong, nor sufficient of itself to support conviction, the criterion being that it legitimately tends to connect accused with the offense. Moore v. State, 30 Ala.App. 304, 5 So.2d 644. A liberal construction is accorded the statute requiring that the testimony of an accomplice be corroborated by other evidence. Fagan v. State, 35 Ala.App. 13, 44 So.2d 634, cert. den. 253 Ala. 444, 44 So.2d 638. Whether or not there is sufficient corroborative evidence of the accomplice's testimony to take the case to the jury is a question of law which is addressed to the decision of the court. Its probative force, credibility, and sufficiency are matters for the jury. *Fagan,* supra.

We hold that there was no error on the part of the trial court in permitting the witness George to give to the jury, over defendant's objection, his factual version of the homicide and of the events relevant thereto.

The record indicates that during the closing argument of the district attorney the following proceedings were had:

"—And, Ladies and Gentlemen of the Jury, this article appeared in the September 3rd, 1971, edition of the Anniston Star, 'ANNISTON LEADS MURDER CATEGORY ON FBI LIST.'

"MR. HUBBARD: Object to that.

"THE COURT: I object to that myself; that is highly irrelevant.

"MR. HUBBARD: We object to that part of the argument as being very very inflammatory, and being very prejudicial toward the defendant, Curtis Magouirk, in this case. We respectfully ask Your Honor to appropriately instruct the jury regarding those last remarks.

"THE COURT: All right, Ladies and Gentlemen of the Jury, the District Attorney exhibited to you there a newspaper article. I have cautioned you throughout the entire trial about newspaper articles. This is highly irrelevant, and unethical; and I ask you to disregard that completely. There is not any evidence in the case, whatsoever, con-

cerning that; and the District Attorney is instructed not to use that type argument any more.

"MR. HUBBARD: May it please the Court, I respectfully move for a mistrial of this case.

"THE COURT: I overrule your motion for a mistrial.

"MR. HUBBARD: We except, Your Honor."

 Nowhere in the record can we find any prior or subsequent reference by the district attorney to the newspaper article. The assertion by appellant in his brief that such additional reference was made cannot be taken to supplement or contradict the record. Nelson v. Hammonds, 173 Ala. 14, 55 So. 301. This court is bound by the record and cannot consider statements in brief not supported by the record. MacMahon v. City of Mobile, 253 Ala. 436, 44 So.2d 570.

We think the aforequoted article in the Anniston Star was a news item reasonably calculated to impress its readers with the frequency of murders in Anniston as reported by the F.B.I. This frequency was probably a matter of common knowledge among the readers of the Star. The exhibition of the article to the jury was an indirect appeal by the district attorney for law enforcement which then and now is frequently emphasized, both in the press and at governmental levels.

In Grissett v. State, 241 Ala. 343, 2 So. 2d 399, a prosecution for murder, it was held that the prosecuting attorney's argument, "I am tired of murders, one after another in this district," was not improper.

We held in Amerson v. State, 43 Ala. App. 148, 182 So.2d 901, cert. denied 279 Ala. 685, 182 So.2d 906, that the closing argument quoted below was permissible:

"Think about how hard it is for the law enforcement officers to get out and work, and all you hear is, Ah, they are shooting folks up in Covington County, cutting folks up in Covington County. They don't do nothing about it up there in court. You hear those remarks."

 While we think the exhibition of the article to the jury exceeded the bounds of a proper appeal for law enforcement, we are nevertheless unwilling to hold that it was so improper that it was ineradicable from the minds of the jury and that the instructions of the court to disregard the article would go unheeded. We are also unwilling to say that the article created indelible prejudice against the defendant in the minds of the jury. Appellant's motion for a mistrial was properly overruled.

Appellee states in brief that there is some indication in the transcript that the trial court permitted the jury to separate during the progress of the trial. Appellee devotes considerable space in its brief in an effort to show that the separation was error without injury.

We have meticulously examined the record for such indication of separation and are unable to agree that such separation occurred. Appellant does not here assert such separation. We pretermit writing on the subject.

The record contains 13 given charges and 46 refused written charges requested by appellant. Included was an affirmative charge for appellant with hypothesis.

We have examined each of the refused charges and agree with the trial court in its judgment denying motion for a new trial in which it states that they are "either insufficiently stated as legal grounds . . . or incorrect statements of law, or abstract statements of the law not predicated on the evidence, or covered by other given requested charges or the Court's oral charge to the jury, and are therefore insufficient grounds to grant the defendant's motion for a new trial." We conclude that the trial court was free of error in refusing to give the subject charges; also correct in refusing the affirmative charge.

Appellant does not in brief insist that the court erred in refusing the charges except the affirmative charge.

Appellant asserts that without the evidence of Tony George, there was no evidence connecting him with the commission of the crime, and that this is what prompted the State to make a deal with the co-defendant George to take the stand and testify on behalf of the State in return for a nolle prosequi of his case. The record shows that soon after the defendant's trial, the State procured a nolle prosequi of the case against George. This action was entered by another circuit judge of the district.

 The defendant in his cross-examination of George spent considerable time in questioning George in an effort to expose an alleged "deal" but was unsuccessful. George insisted that he followed the advice of his attorney in testifying. In view of the weakness of the case against George, we are unwilling to say that the State was improperly motivated to procure a nolle prosequi of George's case.

The transcript in this case contains 420 pages of evidence plus 16 pages for the oral charge of the trial court. We have omitted many details of the evidence which would unduly lengthen this opinion beyond reasonable brevity. We have spent considerable time in reviewing the entire record. We were greatly aided by the excellent index which the Circuit Clerk included in the record.

We think that the trial court in its rulings was free of error, and that the jury reached a verdict of guilty amply supported by evidence which it concluded to be credible.

The judgment of the trial court is due to be affirmed and it is so ordered.

Affirmed.

All the Judges concur.