299 So.2d 305

**Vernon Hughes CROUCH**

v.

**STATE.**

**8 Div. 266.**

Court of Criminal Appeals of Alabama.

June 4, 1974.

Rehearing Denied June 28, 1974.

Joe Gilliland, Russellville, for appellant.

William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

CATES, Presiding Judge.

Second degree murder: sentence, thirty-five years imprisonment.

I

On an autumnal morning (October 11, 1971) a lone squirrel hunter was near an empty farm house in Franklin County, about five miles south of Belgreen on the old Hodges Road. His two dogs "got to sniffing around" a boarded-over well.

This Nimrod, yclept Floyd Oliver, pushed aside some of the planking and peered into the well. There some twenty-five feet below he described an object "about that long." He could smell something, but was unable to associate the odor with anything within his experience.

Alarmed, Oliver went to Belgreen and from Jim Hester's store called the sheriff. The latter dispatched two of his deputies to the farm.

A wrecker was used to hoist what turned out to be the decomposed body of Carl Fleming from the well. Later the sheriff went down on a ladder and retrieved two sheets, a shoe and a floor mat from a car. Fleming's father testified that he had last seen his son about a week before his body was found. At that time he was getting in a car driven by Lee Ables. Also in the car was Snake Crouch (as the elder Fleming called appellant).

A State's witness, Wayne Oliver, saw this trio at his home about eleven o'clock the same night. They drove up asking for a case of beer "on the credit." There were two women in the car.

We excerpt from this Oliver's testimony on direct:

"Snake wanted a case of beer on the credit and I told him I didn't have it and they started arguing with me and I told them I didn't have it and Fleming's stuck a gun out at the window at me and threatened to shoot me and I said, no you better not shoot me, I know what kind of trouble you got into today and Snake turned around and told Carl Fleming to lay the gun down and he did and it went off like that and they left then.

"Q In your best judgment, how long were they there?

"A About 10 minutes or maybe more.

"Q Did you see in what direction they left in, where they went to?

"A They went toward Hodges.

"Q Did they get any beer while they were at your place?

"A No.

"Q Did you see the Defendant or Carl Fleming or Lee Ables, again, after that night?

"A No, sir."

The main witness for the State was John Scott, Jr., "Junior." He testified that Crouch and Ables came by his house about three in the morning of the day following, i. e., October 5, 1971. We quote from part of the transcribed testimony:

"Q You said you saw the Defendant, on October 4 of last year. Where were you, when you saw him?

"A That was October 5th, I believe, Mr. Jolly. It was on Tuesday morning around 3:00 o'clock.

"Q About 3:00 o'clock in the morning?

"A Somewhere around there.

"Q Where were you, when you saw him?

"A At my house.

"Q Who else was at the house?

"A My wife and children.

"Q Junior, let me ask you this. Who was with the Defendant, when he came there?

"A Lee Ables is all that I saw.

"Q When he first got there?

"A Yes. When I went to the door, just him and Lee Ables was the only one that I saw.

"Q When did you see the Defendant, then?

"A When I went to the door, Snake was sitting in the car.

"Q When did you first know Snake was out there in the car?

"A When I got in the car, really, I could tell there was somebody in the car, but I didn't know for sure it was him, until I got in the car.

"Q Before getting in the car, what, if anything did you do?

"A When I went to the door, Lee ask me about this shovel, and I went and got the shovel for him, and put it in the trunk of the car.

"Q Did Snake say anything to you about you get in the car?

"A No. I don't believe Snake said anything to me, when I got in the car.

"Q Where did you get into this vehicle, Junior? What part of the car, did you get into?

"A I got in the front seat.

"Q Where was the Defendant, then?

"A He was sitting in the front seat.

"Q Where was Lee?

"A Lee was driving the car.

"Q What make or model car was this?

"A It was a dark car with a black vinyl top.

"Q Do you know the make or model of the car?

"A I am not for sure of the make or model of the car.

"Q What happened, after you got in the car?

"A I got in the car, and set down, and Lee started driving off.

"Q Before getting in the car, had either, the Defendant or Lee told you what they wanted you for?

"A No.

"Q After the car started driving off, tell the jury what happened?

"A After the car started driving off, I ask them where was we going, and Ables said, he had a job, he wanted me to help them do, and started pulling out of the driveway; about the time we pulled in the highway, and I ask him, what, and he said, bury a man.

"Q That was Lee Ables?

"A Yes.

"Q After you got in the car, did you see any weapons in the car?

"A Yes. Snake had a pistol. He had his hands. I saw that, after I got in the car.

"Q Where was the pistol?

"A He had the pistol in his hand, something about like this.

"Q Your [sic—you're?] indicating between the legs?

"A Yes.

"Q Do you know what kind of pistol that was?

"A No. I don't know what kind it was.

"Q What happened, then, Junior, after Lee told you this?

"A Well, after he told me that, we drove on down to the Hendricks place.

"Q The Hendricks place, where is that, in relation to Belgreen?

"A That's south of Belgreen, on Hodges and Belgreen Road.

"Q Do you have a judgment, as to how far south of Belgreen it is?

"A I would say, possibly, 5 or 6 miles.

"Q Do you have that place rented out, or do you own any of that land around the Hendricks place?

"A Yes. I bought part of the Hendricks place, and I've got the rest of it leased.

"Q Let me ask you this. What happened, when you got there? Was there any other conversation, before you got to the Hendricks place, that you remember?

"A Yes. Lee and Snake was talking to each other. I don't recall, just word for word, what was said before we got down there to the Hendricks place. We got down there to the Hendricks place; we pulled in front of the Camper Bus, and Snake told me to get out, and I got out, and Snake got out behind me, and Lee got out on the other side.

\*　\*　\*　\*　\*　\*

"Q What happened then, after you got out of the car?

"A Well, we got out of the car, and Snake told me to go in the house, and get a quilt, and I told him, I said, there's not a quilt in the house. No body lives here, and he told me to go in the Camper Bus, and get something out of there.

"Q This was the Defendant that told you that?

"A Yes. Snake. He was talking to me, and I went in the bus, and got some sheets, or something, I don't know for sure what it was. I couldn't tell.

"Q Was there any lights on in the bus?

"A No.

"Q What happened, after you got the items out of the bus?

"A I brought them out of the bus, and give them to Snake.

"Q What happened then?

"A Lee says, come on, and he started walking around in front of the house, and

I followed him, and Snake followed me down to the wire fence, where the body was laying.

"Q Junior, do you have a judgment, as to what time this was, when you got to where the wire fence was?

"A No. Not for sure, I don't know, for sure. It wasn't long. Well, we left my house, and drove straight down there.

"Q Junior, did anyone have any lights with them at that time?

"A No.

"Q Do you recall if the moon was shining that night, or was it overcast?

"A Well, it was partly cloudy, and it would be dark and light.

"Q Do you recall if there had been any rain that night?

"A Yes. It had rained some that night.

"Q What happened, when you got to the wire fence?

"A Well, when we got to the wire fence, there this body laid at the fence, and Snake spread the sheets on the ground, and him and Lee put the body in the sheets.

"Q Where was the body laying, in relation to the wire fence?

"A It was laying on the south side of the wire fence.

"Q Would that have been on the same side, or the other side of the fence, that the house is on?

"A Same side.

"Q Did anybody take anything off the body, at that time?

"A Lee Ables taken a billfold.

"Q Was anything taken from the billfold, do you recall?

"A I don't know, for sure, whether he taken anything from the billfold, or not. I looked away, about the time he was looking in the billfold, and when I turned back,

he was putting the billfold back in the pocket.

"Q Did you know, who the body was? Did you recognize the body?

"A No. I didn't know who the body was, at that time.

"Q Prior, to going to the fence, had anyone told you what had happened?

"A When we first got down there and got out, they was talking about shooting a boy, and Snake said, he had shot him 7 times with the pistol, and Ables said, he had got the last shot—said he'd got the last shot—said he stuck the gun to his head, and blowed his brains out.

"Q Was the Defendant there, at the time that statement was made?

"A Yes. All 3 of us were there.

\*   \*   \*   \*   \*   \*

"Q Now, after the body was put on the sheets, there, where was the body taken to?

"A They drug the body back up here to the road. They had backed the car up here, and they drug the body up here to the road, and Lee went around and got the car and backed it around, kind of in this area, here, and put the body in the trunk of the car, about right here.

"Q Do you know, what kind of car Lee Ables had at that time?

"A I had seen him driving a white Chevrolet-Chevelle.

"Q Was that a Super Sport, or do you recall?

"A I believe so, I'm not sure. He kept it jacked up in the rear end. It was a Chevelle, Super Sport, I guess.

"Q What was done, with the car, after the body was put in the trunk?

"A They put the body in the trunk of the car, and they come on down here.

There are two old houses, down here below the Hendricks house. The first one is here, on the right; and the second one, is on the left.

"Q What was said, before going down there, Junior? Was anything said about a well, or anyone ask you any questions about a well?

"A No. There wasn't anything said to me about a well.

"Q Show the jury then, where the car went?

"A We pulled in at the first house on the right, and there's a well—you've got it marked here, but it would be, more, or less, over here, kind of behind this old house, and they tried to put the body in the first well.

"Q Did you take the body out, when you got to that first old well?

"A Did I take the body out?

"Q Yes.

"A No.

"Q Who took the body out?

"A Lee and Snake taken the body out of the trunk of the car.

"Q Who was occupying, what place in the car, on the way down to the well?

"A After they put the body in the trunk of the car?

"Q Yes.

"A Lee got under the stirring [sic] wheel, Snake got in, and I got in.

"Q What happened then, when you got to that old well, Junior?

"A Got to the well, Snake and Lee got the body out, and tried to put it in this well, here; and that well is filled up with rocks.

\*   \*   \*   \*   \*   \*

"Q What happened, after that?

"A They couldn't get the body in that well, and they taken it, and put it back in

the car, and drove down here, and pulled him up in front of this house, and put it in this well, here.

"Q Before leaving that first well, did you see anybody throw anything away?

"A Lee Ables threw a shell, or shell-blank away.

"Q Did you recognize the shell, or could you identify it again?

"A No.

"Q What happened when you got to the second well?

"A Well, we got down to the second well, and they told me to stand behind the car, and watch; and they drug the body out of the trunk of the car and threw it in the well, and when they was dragging the body out of the trunk of the car; they drug one of his shoes off.

"Q Did you see that?

"A I seen the shoe come off, there, behind the car.

"Q Who took the body, out of the car?

"A Lee and Snake.

"Q What was done, after the shoe came off?

"A Snake threw it in the well.

"Q Did you help them put the body in either one of those wells?

"A No. I didn't help them put it in either one.

"Q Did you help, either, Snake or Lee Ables put the body in the car, either time it was put in the trunk?

"A No. I didn't.

"Q What happened, after the body was put in the second old well?

"A After they put the body in the second well, we got back in the car, and they brought me back to my house.

"Q In your best judgment, what time was it when you got back to the house?

"A Somewhere, around 4:15, I guess.

"Q Junior, on the way back to house, was there any conversation about what Lee or Snake were going to say, if anyone ask about the body?

"A Yes. On the way back to the house, there was something said about it, and Lee said, the boy—Lee done most of the talking—he said, that the boy was with his mother and daddy up here in town that day; and he got with them, and he would tell them that he got out of the car with them that night, and got in the car with some boys from back down there around 11:00 o'clock.

"Q While they were down there with the body, did they mention anybody's name?

"A Lee kept mentioning a Cole.

"Q Did you ever hear the name Carl used, while you were at the Hendricks place?

"A Yes. They was mentioning Carl's name, and a Cole name, at the body.

"Q On your way back to your house, what, if anything, did the Defendant tell you about the vehicle?

"A Snake ask me, did I have any place, he could hide the car. Said, it was a stolen car."

The coroner testified over objection—without any specified grounds therefor—that based on his experience he estimated that the deceased had been dead six days. This witness observed three gunshot wounds; "two shot guns and one pistol or rifle * * *." In his opinion the shotgun wound to the forehead was fatal.

The defendant did not take the stand nor did he adduce any evidence.

## II

Counsel for appellant cites Pointer v. State, 24 Ala.App. 23, 129 So. 787, as supporting his contention that the District At-

torney's asking questions calling for evidence residing in hearsay, etc., was prejudicial to the degree of reversal.[1]

■ As to the first cited example there came into evidence a stipulation that the FBI agent who arrested Crouch in Avon Lake, Ohio would have testified that Crouch had papers on his person, among things, bearing the name "Carl J. Busick." Hence, the Sheriff's testimony was not prejudicial.

■ In the second example the sustention of defense objection to the question about marihuana sufficed. The witness had not answered, hence only a question was in the record. Ordinarily a mistrial is too drastic a penalty in such a posture.

A mistrial only springs into being upon "a manifest necessity * * * or when the ends of justice would otherwise be defeated." Code 1940, T. 30, § 100. Thomas v. Ware, 44 Ala.App. 157, 204 So.2d 501; Harnage v. State, 290 Ala. 142, 274 So.2d 352.

Section 100, supra, was enacted pursuant to the proviso of the 1901 Constitution, § 9 empowering courts "for reasons fixed by law" to "discharge juries from the consideration of any case * * *." This proviso did not appear in the Constitutions of 1819, 1861, 1865, 1868 or 1875. See discussion in Parham v. State, 47 Ala.App. 76, 250 So.2d 613.

In his third claimed horrible example, it is clear from the record that the deceased's wife did not testify before the jury as to Crouch and Fleming being in a ring to pass counterfeit notes.

■ As to the last example, Scott's testimony of Crouch and/or Ables saying in the presence of all three that the car was stolen, we consider this was relevant as bearing on an attempt at concealment of the culprits' identity.

We find no error.

### III

Neither Junior Scott's testimony nor any of the evidence otherwise before the jury made out a case for the corroboration of an accomplice under Code 1940, T. 15, § 307 as a matter of law. On the record before us Scott could not have been indicted for the murder of Fleming. See Daniels v. State, 50 Ala.App. 88, 277 So.2d 364.

■ Even in cases where the evidence is in dispute as to the complicity of a witness there is presented a question—not of law for the judge—but of fact for the jury. Fairbanks v. State, 46 Ala.App. 236, 239 So.2d 908; Magouirk v. State, 49 Ala.App. 420, 272 So.2d 625; Dubose v. State, 50 Ala.App. 652, 282 So.2d 91.

1. "The first example appears in Transcript on page 68 and 69. In this instance the sheriff was asked what name the defendant was using at the time of his arrest. This question was objected to, as calling for hearsay. After the sheriff answered 'I believe he was using Carl', an objection was raised and motion to exclude was granted. (Tr. 69). On being cross-examined, defendant's counsel asked if the sheriff was present when the arrest was made, the sheriff replied, "no sir". Defense counsel then asked for a mistrial, which was overruled. (Tr. 69).

"The second example of the District Attorney's seeking irrelevant, prejudicial testimony was during the questioning of the State's star witness. Without any previous testimony the D. A. asked Jr. Scott, 'at any time, before October 4th, did you see the defend-

ant when he had some Marijuana with him, and showed you some Marijuana?' (Tr. 71 & 72). Defendant's request a mistrial was not granted.

"The third blatant example of illegal, prejudice producing testimony concerned the wife of deceased. The State asked her if defendant and deceased engaged in counterfeiting, and on being allowed, the State failed to show cause for the introduction of such testimony. (Tr. 115–118).

"Another example of blatant heresay [sic] being introduced by the State's counsel occurred when Jr. Scott was asked if the car in which they were riding had been stolen and for the details of its being stolen. Defendant's objection to the above line of questioning was overruled. (Tr. 79)."

—Above taken from appellant's brief.

## IV

There was sufficient evidence to support the verdict and judgment.

## V

We have carefully considered each and every of the rulings below adverse to the contentions of the appellant. We commend his counsel for compliance with Rule A, 49 Ala.App. XXI and his diligence in undertaking his professional duty.

From this review we are at the conclusion that the judgment below should be

Affirmed.

All the Judges concur.