489 So.2d 653 (1986)
George LOCKETT, alias
v.
STATE.
8 Div. 325.
Court of Criminal Appeals of Alabama.
January 28, 1986.
Rehearing Denied February 25, 1986.
Certiorari Denied May 23, 1986.
*654 Mark McDaniel, Huntsville, for appellant.
Charles A. Graddick, Atty. Gen., and Victor Jackson, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 85-620.
TYSON, Judge.
George Lockett was indicted for possession of marijuana and for possession of cocaine. The jury found the appellant guilty of both offenses. He was sentenced to twelve years' imprisonment in the penitentiary.
On the evening of August 22, 1984, Hollis Lowery, a patrol officer with the Huntsville Police Department, received a dispatch on a shooting at 2830C Turf Avenue. When Lowery arrived, a black man ran up to him and said that a black male with a gun was in the apartment.
The glass storm door to the apartment had been broken. The main door was wide open. When Lowery looked into the apartment, he saw a man lying on the floor with a pistol in his hand. The man was not moving so Lowery entered the apartment.
Lowery went over to the man, removed the gun from his hand and checked for any signs of life. There were none. He then checked the apartment and determined no one else was there. In the process of checking the apartment, Lowery saw a seat cover box in the living room. The top was open and Lowery saw a plastic bag with green plant material in the box. He also observed white powder on a piece of paper on the ironing board. A knife was lying *655 beside the white powder as well as some money. Some money was also next to the man's body.
D.O. Sharp of the Huntsville Police Department took photographs of the scene as well as the evidence collected there.
Ray Tielking, supervisor of the organized crime bureau of the Huntsville Police Department, went to the scene that night. The OCB investigates the vice and narcotics cases in the department.
After the homicide investigation concluded, he began his investigation of the scene. At some point, he called Officer Paul Ballance to bring him a Scott Reagent Field Test. He also requested Ballance to collect the evidence that was found.
Listed below is the evidence which was collected from the scene.
Kitchen
(1) White powder lying on piece of paper on ironing board
(2) Knife and pipe packing tool found next to white powder on ironing board
(3) Currency on ironing board
(4) Set of scales found in box on counter
(5) One bottle of manitol, one block of manitol, and one bottle of inositol in kitchen cabinet (inositol is a cutting agent for cocaine)
(6) White powder on piece of paper in butter dish of refrigerator
(7) Brown paper bag with 100 empty manilla envelopes found next to water heater
Bedroom
(1) Crown Royal bag with currency inside found on bedside table
(2) Purse found with four manilla envelopes containing green plant material
(3) Suit case with cashbox containing large amount of currency
(4) Wallet found in pair of pants on floor containing the appellant's driver's license, bank account cards and food stamp certificate
Living Room
(1) Seat cover box containing large plastic bag of green plant material found in between sofas
(2) Briefcase found on sofa containing loose green plant material
(3) Brief case containing small plastic bag of green plant material
(4) Blue plastic bag which contained 30 manila envelopes of green plant material
(5) Cigarette case containing currency and Ellie Moore's driver's license
(*) Various amounts of currency were found throughout the apartment
The majority of the currency found in the apartment was counted by Ballance. It totaled $13,240.
Ballance turned over the white powder found on the ironing board and in the refrigerator to Martha Odom of the Department of Forensic Sciences. He also gave Odom the large and small plastic bags of plant material, the 34 manila envelopes of green plant material as well as the loose green plant material contained in the briefcase.
Odom analyzed the white powder and determined the substance was cocaine. The total weight of the cocaine was one gram. After examining the green plant material, Odom determined it was marijuana. The total weight of the marijuana was 16.1 ounces or 458 grams.
On the evening of August 22, 1984, Officer Harry Renfroe went to the Huntsville Hospital emergency room on the report of a shooting victim. When he arrived, he learned that the victim was this appellant. At this time, the appellant was not connected to the events at 2830C Turf Avenue. Renfroe asked the appellant what had happened. The appellant said that he had been shot at a house in Norwood. He said a man came to rob "them" and shot him. The appellant then returned fire and shot the man. He said the man's name was Raymond Jude.
Renfroe then called Officer James Parker who was at 2830C Turf Avenue investigating *656 the homicide. He told Parker that the homicide victim might be Raymond Judge. Parker then went to the hospital and talked to the doctor. The appellant was released into police custody that night and transported to the city jail.
When the appellant arrived at the jail, he was advised of his Miranda rights and read a waiver of those rights. The appellant indicated he understood those rights, waived them, and wished to talk. (R. 286-288)
The appellant gave his address as 3015 Holmes Avenue but stated he often stayed with his girlfriend, Ellie Moore, who lived at 2830C Turf Avenue. On the night in question, he went over to Moore's around 8:00. Soon after, his sister, Jeanette Lockett, arrived.
At some point, the appellant went to the bathroom. While there, he heard a knock on the front door. Moore let Raymond Jude and Henry Bradley inside while another man stayed at the door. Both men had sacks which he thought had drugs or drug paraphernalia in them. Jude said he needed money. When Moore looked in the bag, Jude pulled out a gun. The appellant then went into the kitchen and got his gun.
As he reached for the gun, Jude shot him in the back. The appellant turned around and shot Jude and fired again until he fell down. The appellant then ran out the back door and climbed the fence. He then went to a friend's house. This friend, Sarge, took him to the hospital.
When the appellant was asked about the drugs at 2830C Turf Avenue, he stated that they belonged to him and Moore, and he knew that he would get caught someday. He said a man in a black Cadillac would drop off the drugs.
The next morning, Renfroe got the appellant out of jail. He advised the appellant of his Miranda rights and read him the waiver. The appellant said he understood his rights, waived them, and he wanted to talk.
When asked if he could help the police locate Ellie Moore, the appellant said there were a few numbers that he could call, which he did later. Moore had not been located at the time of the trial.
When the appellant was questioned about the events of the previous night, he told Renfroe basically the same story he had told Parker the night before. The appellant also told Renfroe that the drugs in the apartment belonged to him and Moore, and that they sold drugs from the apartment.
At this point, Parker came into the room. The appellant gave a written statement which he wrote out himself.
His statement reads as follows:
"I arrived at Turf Street at about seven o'clock. Eats and go to the restroom, wash and change pants. Of course, I hear what is going on but can't see don't think I have to see everyone.
"Raymond Jude and Henry Bradley come to the door. Ellie don't know them and I don't myself know the third person standing in the background. They say have you got anything. I said, I am not holding. And they leaves. They come back later about ten minutes and ask for Ellie and did she have any smoke. She call me to the door with her and Raymond con his way in, and the others say they don't have to come in. Now, Raymond is in and trying to cope a nickel. Henry is standing at the door, one foot in, one out looking with his hand in his pocket. Me and my sister is walking toward the stove as we smell trouble. I put my gun in my back. Jeannette is still holding the baby. Raymond ask Ellie for money. She refused to give. Jude pull his gun on Ellie and I go for my piece. I am hit in side and he takes two bullets, maybe more. He fall hurt and I am still standing. Henry runs, Ellie scream, my sister holler and run. I go, too." (R. 318-19)
Shelia Patton testified that she is employed at SCI in Madison County, Alabama. In August of 1984, Ellie Moore worked in her department at SCI. Moore continued working at SCI until January of 1985. During that time, Patton knew there were *657 warrants out for Moore's arrest, but she never contacted the police. Patton heard Moore talk about the appellant when they worked together. She didn't know where Moore was at the time of trial.
Catherine Acklin, the manager of the Norwood project for the Huntsville Housing Authority, testified that the apartment at 2830C Turf Avenue was rented to Moore on November 22, 1983. Moore lived there with her two children. The apartment was declared vacant on September 12, 1984, and the lease was terminated.
The appellant stated that in August of 1984, he lived with his mother at 3015 Holmes Avenue. Ellie Moore was his girlfriend, and she lived at 2830C Turf Avenue. The appellant stated he would visit Moore at times but never stayed there.
When the appellant would accumulate money, he would take it to Moore for her to keep because he did not trust banks. However, he and Moore did have a joint bank account.
Of the money found at the apartment that night, the appellant said $11,000 or $12,000 of it belonged to him. He testified that he was a professional gambler by occupation and that most of the money came from his gambling winnings. The appellant testified that he received $9,200 from the sale of his house in July of 1982. He also received a $9,225 insurance check following the death of his wife in 1982. Further, he received $1,677 on a judgment.
The appellant denied any knowledge of the cocaine and marijuana found in the apartment. He also denied telling the police that the drugs belonged to him and Moore. He said he never told the police anything about knowing he would get caught, or about a man in a black Cadillac.
He said he was hurting during the statements he gave to the police and asked for a doctor.
The appellant said he had seen Ellie Moore since August of 1984. He did not know where she was but knew she was in town.

I
The appellant contends that the warrantless search of the premises at 2830C Turf Avenue was unreasonable and illegal, and, therefore, his motion to suppress was due to be granted.
"A person can claim the protection of the Fourth Amendment only if he can show some legitimate expectation in the area or object searched." United States v. Long, 674 F.2d 848, 852 (11th Cir.1982). (Footnote omitted.) "Only those persons whose privacy is invaded by a search have standing to object ..." to that search. United States v. Colbert, 474 F.2d 174, 176 (5th Cir.1973).
Clearly, the appellant did not have a legitimate expectation of privacy in the apartment. The apartment was rented by Ellie Moore, who lived there with her two children. Although the appellant visited the apartment frequently, he did not reside there. The appellant was not present when the search of the apartment was conducted. Therefore, the appellant had no standing to object to its search. See Pyles v. State, 448 So.2d 416 (Ala.Cr.App.1983), appeal after remand, 448 So.2d 421 (Ala.Cr.App. 1984).
Furthermore, the appellant had no standing to object to the search and seizure of the marijuana and cocaine found in the apartment. The appellant voluntarily abandoned the evidence in question when he fled the scene. Therefore, he had no legitimate expectation of privacy as to the evidence seized when the search was conducted. See Colbert, supra.
For the reasons stated above, the appellant's motion to suppress was properly denied.

II
The appellant objects to the admission into evidence of all of his statements made to police officers.
The appellant's statements to Officer Renfroe in the emergency room were not in violation of Miranda v. Arizona, 348 *658 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The appellant, at this time, was not the subject of custodial interrogation. He was merely being questioned by Renfroe as a victim of a gunshot wound. Therefore, this statement was properly admitted into evidence.
The other three statements were also properly admitted into evidence. Each of the statements was made after the appellant had been advised of his Miranda rights and had been read a waiver of those rights. Each time, the appellant indicated he understood those rights, waived them, and wished to make a statement. The officers testified that no threats, promises, hopes of reward or other inducements were made or offered in order to obtain the appellant's statement. Further, the appellant did not appear to be under the influence of any drugs or alcohol when he made his statements. Certainly the State presented sufficient evidence to overcome the presumption that the statements were involuntarily given.
The only evidence which the appellant gives in support of his claim of involuntariness is that he had recently been the victim of a gunshot wound and was in a lot of pain when he made his statements.
This evidence was refuted by the officers. Although the appellant told one of the officers that he was a little sore, he did not appear to be in pain, and did not ask for medical help at the time of giving the statements.
After our review of the evidence, we conclude that the trial judge properly determined that the appellant's statements were voluntarily made. There is no error here. Shewey v. State, 48 Ala.App. 730, 267 So.2d 520 (1972); Bills v. State, 49 Ala.App. 726, 275 So.2d 706 (1973), and authorities cited therein.

III
The appellant claims that the State failed to prove the corpus delicti independent of the appellant's confession.
"It is a settled principle of law that a mere extrajudicial confession, uncorroborated by other facts, is insufficient to show the corpus delicti and cannot support a conviction. Matthews v. State, 55 Ala. 187, 28 Am.Rep. 698 (1876); Reynolds v. State, Ala.Cr.App., 346 So.2d 979, cert. denied, Ala., 346 So.2d 986 (1977). However, it is equally as settled that inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admission or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existance of the corpus delicti. Hill v. State, 207 Ala. 444, 93 So. 460 (1922); Bryant v. State, 33 Ala.App. 346, 33 So.2d 402 (1948).
"Circumstantial evidence may afford satisfactory proof of the corpus delicti. The presentation of facts, from which the jury may reasonably infer that the crime charged was committed, requires the submission of such question to the jury. Johnson v. State, 247 Ala. 271, 24 So.2d 17 (1946); Taylor v. State, 276 Ala. 232, 160 So.2d 641 (1964). Reasonable inferences may furnish a basis for proof beyond a reasonable doubt. Royals v. State, 36 Ala.App. 11, 56 So.2d 363, cert. denied, 256 Ala. 390, 56 So.2d 368 (1952)."
Watters v. State, 369 So.2d 1262, 1271-72 (Ala.Cr.App.1978), reversed on other grounds, 369 So.2d 1272 (Ala.1979). See also Hadley v. State, 448 So.2d 465 (Ala.Cr. App.1984).
We find that the State did present evidence which tended to prove the corpus delicti. The officers searched the apartment and found various quantities of marijuana and cocaine throughout the apartment. Some of the contraband was exposed outright in view of anyone entering the premises. The appellant's wallet, with his identification, was found in a pair of pants in one of the bedrooms. This evidence, viewed in light of the appellant's confession, was sufficient proof of the corpus *659 delicti. See Mills v. State, 41 Ala.App. 206, 126 So.2d 499 (1961) (a similar fact situation wherein the appellant was convicted for the unlawful possession of prohibited liquors).
There is no basis of error on this issue.

IV
The appellant challenges the sufficiency of the evidence on the ground that the State did not prove his possession or ownership of the marijuana and cocaine. We do not agree.
The appellant's wallet was found in the apartment where the marijuana and cocaine were located. He told the officers that the drugs belonged to him and Ellie Moore. This evidence was sufficient to establish the appellant's ownership of the drugs. Mills, supra.
Therefore, we conclude that there was evidence presented at trial from which the jury could conclude, by fair inference, that the appellant was guilty of the offenses charged beyond a reasonable doubt. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1979), and authorities cited therein.

V
The following portion of the transcript took place after the opening statements in this case but prior to the presentation of any evidence.
"THE COURT: Let's see, now, who was it wondering about lunch? Well, it's not long, but we will go a little while. Let's see, now, Lisa Jones. You told me yesterday when we first recessed that some person that works with you had mentioned the name Ellie Moore or something in connection with this case. Now, you were not asked anything about any acquaintance that would invoke a response from you concerning what you told me, but I thought maybe I would give the parties here an opportunity to pursue the matter, since we have not yet started with the case or the evidence in the case, to make sure that your knowledge or what you do know would not have any bearing on your ability to sit impartially as a juror in this case. So, I think the parties would have that right to do that. So, would you just state now what it is that you told me. I have forgotten myself.
"MS. JONES: Okay. A girl that I used to work with at SCI, and I used to work with Ellie Moore, too, when the incident whereshe told meshe called me on the phone and told me about Ellie and the situation that went on that night, you know. And she knew people getting busted with cocaine. And I didn't realize that until Ellie Moore's name.
"THE COURT: Because there was no mention in the selection process. That is true. Now, do you think what you have been told would influence you in your ability to render a fair and true verdict in the case?
"MS. JONES: It might. I might not be able to.
"THE COURT: Well, we have already selected you now, see, that's the problem.
"MS. JONES: That's the problem.
"THE COURT: Okay. Well, let me ask you to go back into the juryroom and let me consider this matter, and I will come back to it. Okay. So, please, go back into the juryroom. You haven't talked to any of the other jurors about your knowledge, have you?
"MS. JONES: No, sir.
"THE COURT: Do not say anything to them.
"(Whereupon, the jury was sent to the juryroom at 11:38 A.M., at which time, the following occurred out of the presence and hearing of the jury:)
"MR. GRIFFIN: Your Honor, I feelif I may address the bench on it, I feel
"THE COURT: Well, I think this: I think we possibly ought to consider something at this point. Since none of the evidence has been presented, I think we could dismiss that juror and qualify another one. We have got other jurors available. And seat another juror in place of that juror.
*660 "MR. GRIFFIN: Judge, in view of her statement in front of the whole jury I would object to that, I wouldn't have any objection to qualifying entirely another new jury, but I am notI am concerned about how we go about picking another juror.
"THE COURT: Well, she did not
"MR. GRIFFIN: One single juror.
"THE COURT: She made no indication about it one way or the other.
"MR. GRIFFIN: I mean, her statement, though.
"THE COURT: Well, I would have to ask
"MR. GRIFFIN: That was made in front of the jury.
"MR. WEBSTER: That was in their opening statement, the jury heard that.
"THE COURT: Sure. But I would be glad to ask the other jurorsfirst of all, I will be glad to dismiss that juror and we can proceed with eleven by agreement, or we can seat another one or qualify and seat another one, and obviously in the process I would inquire of the remaining eleven whether or not they are influenced by the statement that she made here in open court. And as Mr. Webster said, she has said nothing more really than what has been told to them in the opening statements, but I would be happy to hear from you gentlemen on how you would prefer to proceed.
"MR. WEBSTER: I will go with eleven, Judge, but the defendant is the one who is going to have to make the choice.
"THE COURT: Sure.
"MR. WEBSTER: Because if I object it's not going to make a lot of difference. Or I will qualify another juror, whichever you want to do.
"THE COURT: We are not going to go with eleven unless both of you agree with it, and we will seat another one if you want me to. I am not asking you for an agreement, I am just asking you for your thoughts on it, and let me know how you want to proceed, and it will be all right with the court.
"MR. GRIFFIN: Well, Judge, I feel that first, I would have to do this: Based on, as I say, her apparently innocently gathered personal knowledge that she has expressed before the jury, I would feel it my duty to make a motion at this time for a mistrial on the case. And if the motion for a mistrial is overruled by the court, I think we can agree on some procedure to go ahead, but I feel that it coming on at this point, that I would have to make the motion.
"THE COURT: Well, in view ofwith nothing more, I am going to deny your motion for a mistrial. I will further inquire of the totalof the jury, but at this point I would deny it. We have got several options that we can take. We may still have those jurors available from the panel that have already been qualified, and it would be possible just to back up and call for that last one, dismiss one and takeput the one that was lastthe last strike back on.
"MR. GRIFFIN: May I have just a minute to talk with my client about this?
"THE COURT: Sure.
"MR. GRIFFIN: And Reid, too.
"THE COURT: Go ahead. I do think that you are probably entitledthat that juror ought not to sit.
"MR. WEBSTER: I think she feels that way, Judge.
"THE COURT: I think she does, too. Now, she told the court when this was mentioned that it would notwould make no difference one way or another, but I think this morning and overnight she has decided that she would prefer not to sit.
"(Whereupon, proceedings were in recess at 11:40 A.M., until 11:45 A.M., at which time, the following occurred out of the presence and hearing of the jury:)
"MR. GRIFFIN: Your Honor, predicated only on the fact that it appears the court overruling a mistrial on the matter, I am willing towe discussed this briefly, it can be done, to replace the juror with someone else if someone else is available off the list.
*661 "...
"THE COURT: And 34 is acceptable to you?
"MR. GRIFFIN: Yes, sir.
"THE COURT: 34 is acceptable to you, right?
"MR. WEBSTER: I say yes, Judge.
"THE COURT: Well, I am not imposing my views on either one of you.
"MR. WEBSTER: Okay.
"THE COURT: I am not twisting your arm or indicating that you ought to, because we have got several alternatives.
"MR. WEBSTER: I prefer this alternative, because we have already qualified them, and I have had a chance to talk to them and he has.
"THE COURT: Plus, anybody that was struck from the panel, not only has gone through the qualifying
"MR. WEBSTER: But they have heard the opening statements.
"THE COURT: But have also heard the opening arguments." (R. 156-64)
The appellant now contends that his motion for a mistrial should have been granted.
"A mistrial should not be granted unless there is a manifest necessity to discharge the jury or unless the ends of justice would otherwise be defeated. Hallman v. State, 36 Ala.App. 592, 61 So.2d 857 (1952); Crouch v. State, 53 Ala.App. 261, 299 So.2d 305, cert. denied, 292 Ala. 718, 299 So.2d 312 (1974); Diamond v. State, 363 So.2d 109 (Ala.Cr. App.1978); Woods v. State, 367 So.2d 982 (Ala.1978).
"A trial judge is allowed broad discretion in deciding whether under the law a ground for a mistrial exists. Brewer v. State, 24 Ala.App. 410, 137 So. 454 (1931); Hallman, supra; Ballard v. State, 51 Ala.App. 393, 286 So.2d 68, cert. denied, 291 Ala. 772, 286 So.2d 72 (1973); Woods, supra.
"The presence of the trial judge at the scene places him in the best position to determine what effect, if any, some event may have upon the ability of the jury to render a just and true verdict in the case, and his decision in this matter will not be reversed except for a clear abuse of discretion. Franks v. State, 45 Ala.App. 88, 224 So.2d 924 (1968); Shadle v. State, 280 Ala. 379, 194 So.2d 538 (1967); Woods, supra."
Rocker v. State, 443 So.2d 1316, 1319 (Ala. Cr.App.1983), cert. denied, 443 So.2d 1316 (Ala.1984).
In Rocker, supra, one of the jurors received an unauthorized communication after the first day of the trial. The trial judge disqualified the juror and excused her from the jury. He then replaced her with an alternate juror. The trial judge found no cause to declare a mistrial and discharge the jury. This court affirmed the trial judge's decision.
We conclude that a mistrial was unnecessary in the case at bar. The juror who replaced juror Jones (by agreement of both parties) was present in the courtroom during the opening statements. He was included in the jury prior to the presentation of any evidence to jury.
Therefore, we find that the trial judge did not abuse his discretion by denying the appellant's motion for a mistrial.

VI
The appellant claimed ownership of a large portion of the money found in the apartment in question. He attempted to introduce several documents as evidence to show reason that he had so much money. The trial judge refused to admit the documents into evidence. The appellant contends this was error. We disagree.
First of all, the appellant testified that most of the money came from gambling. Secondly, these documents were dated 1982, and the money was found in the apartment in 1984. We would be hard pressed to find that the money received by the appellant in 1982, as evidenced by these documents, is the same money that was found in the apartment in 1984. These *662 documents were "so remote as to time or circumstances that [their] relevance or materiality must rest in conjecture and speculation." Roberson v. State, 339 So.2d 100, 104 (Ala.Cr.App.), cert. denied, 339 So.2d 104 (Ala.1976); White v. State, 380 So.2d 348 (Ala.Cr.App.1980).
Lastly, even had we found these documents to be admissible into evidence, any error which resulted from their exclusion was harmless. The appellant was allowed to testify as to the amount of money contained in these documents. Therefore, he was not prejudiced by their exclusion from evidence. Rule 45. A.R.A.P.
This record is free of error. The judgment of the trial court is due to be and is, hereby, affirmed.
AFFIRMED.
All the Judges concur.