160 So.2d 641

**Leroy TAYLOR**

v.

**STATE.**

**7 Div. 620.**

Supreme Court of Alabama.

Feb. 6, 1964.

Richmond M. Flowers, Atty. Gen. and David W. Clark, Asst. Atty. Gen., for the State.

Ralph D. Gaines, Jr., Talladega, for appellant.

HARWOOD, Justice.

This appellant, Leroy Taylor, has been adjudged guilty of murder in the first degree and sentenced to death.

At the trial below, he pled not guilty, and not guilty by reason of insanity.

The evidence presented by the State tends to show that Cynthia Marie Hawkins, a negro girl seven years of age, lived with her family in Furnace quarters, a negro section in the City of Talladega. Dye Creek ran along the back of the area several hundred feet back of the Hawkins' home.

The family was large, with brothers and sisters ranging from three years up to twenty-three years of age.

On the morning of 6 April 1963, Cynthia Marie and one of the younger children were playing in the yard of her home. The appellant arrived and joined in the play with the children for awhile. About 11:00 A.M., it was discovered that Cynthia Marie was missing, and several of her brothers and half brothers organized a search party. Cynthia Marie's body was discovered around 2:00 P.M., face down in Dye Creek in about a foot of water. The body was taken to the home and laid on a bed. Foam was emerging from her nostrils and mouth.

Thereupon Horace Hawkins, a brother of deceased, aged sixteen, and Albert Powers, her half brother, aged twenty-three, ran to the home of Ola Mae Perkins, the "girl friend" of appellant, in search of the appellant.

The appellant was located at Ola Mae's house. The brothers entered the house and confronted the appellant. Albert asked him why he had drowned their sister. The appellant denied any knowledge of Cynthia Marie's death, and "acted like he didn't know anything about it."

Horace and Albert then began an attack upon the appellant. The fight continued out into the yard. Horace picked up a brick and hit the appellant on the back of the head. This blow knocked the appellant to the ground semi-conscious.

Others had gathered at the melee and intervened at this point to stop further assault by the brothers, one of the intervenors pulling a knife.

At this stage, Pearlie Mae Hawkins, mother of the deceased and of Albert and Horace, arrived on the scene. Albert told her that the appellant had killed Cynthia Marie. She took Albert and Horace with her to their home.

Law enforcement officers were called. They went to the Hawkins' home. The body of Cynthia Marie was still there. After some investigation by the officers at the scene, the body was moved to an undertaking establishment. A search was instituted for the appellant, not only by the law officers, but by a number of the residents of Furnace quarters.

About dark, June Pointer, an uncle by marriage and with whom the appellant lived most of the time, was told that the appellant was in Pointer's car in front of his home.

We note here that the whereabouts of appellant's father was unknown, and appellant's mother lived in Ohio.

Pointer went out and with the appellant started to police headquarters. On the way they met a police car and Pointer informed the officer that the appellant was in his car and was told to bring the appellant on to the jail. This Pointer did, remaining only about five minutes at the jail.

Mr. Robert D. Johnson, a State Toxicologist with eight years experience, arrived in Talladega in the late afternoon. He performed an autopsy on the body of Cynthia Marie. He found that the foam exuding from the mouth and nostrils extended down into the lungs. This is typical in case of death by drowning. Mr. Johnson also found lacerations on the cheek and head and gravel lacerations on the back. He also found the anus dilated, with a mild laceration on the inside.

Between 8 and 9 P.M., the police brought June Pointer to the jail to be present when the appellant was interviewed. Among those present at the interview was Mr. Johnson. After explaining to the appellant the purpose of the interview, and that information secured could be used in event

he was prosecuted, the appellant voluntarily removed his trousers and shirt, the only clothing he was wearing, and consented to a physical examination. This examination disclosed nothing significant. The appellant denied any knowledge of, or connection with, the death of Cynthia Marie. When told he could go home, June Pointer stated it would be best for him to stay in jail that night where "they could take care of him" as "he already done got beat up." This was referring to the fight between Cynthia Marie's brothers and the appellant in the afternoon.

Every person at the interview, including June Pointer, negatived any possibility of any force, threats, or abuse being exercised by anyone against the appellant.

The appellant remained in jail that night.

The next morning Chief Dison of the Talladega Police went to the Hawkins' home for further investigation. There he interviewed several of the younger brothers of the deceased who had been playing with Cynthia Marie the morning before. The chief returned to his office where he had the children brought in pairs and interviewed in the presence of the appellant.

When he was talking with Ronnie Hawkins, age four, and Bobbie Lee Hawkins in the appellant's presence, Ronnie stated that Leroy (the appellant) "had twisted Cynthia's arm, pulled her down through the woods, and throwed her in the creek."

At this point the appellant stated that was not the way it had happened, and then began to make a statement confessory in nature. Chief Dison had Ronnie and Bobbie Lee leave the room, and then listened to a confession by the appellant. Chief Dison immediately had Officer R. M. Rowe come into his office, and the appellant again repeated his confession. Chief Dison thereupon reduced the confession to writing, and it was signed by the appellant, who also signed each page of the confession. This, after Chief Dison had read the document to the appellant.

This confession was received in evidence, the predicate of voluntarinesss having been previously established, not only to the confession itself, but to every confessory statement or admission against interest made by the appellant.

The parts of this confession pertinent to this review read:

"* * * about 12:00 noon I met the children, after playing with them awhile, I got Cynthia Marie" (Hawkins) "by the hand and we walked down through the woods. I told her to come and go with me. She did not resist, or anything—I didn't have anything on my mind and did not think of doing anything to her until we got down to the creek. When we got to the creek is when it flashed to my mind to do something to her. She laid down when I asked her to" (appellant then recounted his unsuccessful effort to have sexual intercourse) "so I got up to wash the mud off my hands. I stepped out in the creek on some rocks. When she stepped down beside me is when I decided to drown her. I don't know why—I just reached out and caught her by the back of the neck and pushed her down in the water with her head face down. She was kicking and I held her that way until she quit kicking and I left her lying that way. I got up and went across the creek and past the trash pile in the Bemiston pasture."

The appellant then gave an account of arriving at Ola Mae Perkins' house, of the fight there between himself and Cynthia Marie's brothers, and of his hiding places thereafter. The confession concluded:

"I went up to my house and stood around a few minutes. Johnny Turner came out of June Pointer's house and I called him up to my house. I asked him where the boys was that had been running me was. He told me to wait. He got June and came back. June told me to get in the car and lay down.

June Pointer, Johnny Turner and R. C. Jones got in and we came to the highway. We met the police. He told them he had me in the car and to come on back to police headquarters. We came on to police headquarters and went in. They took me and put me upstairs * * *."

The defense introduced one witness whose testimony was directed toward establishing an alibi. The testimony of this witness was equivocal, and of little probative value. It probably made little impression on the jury.

The defense also introduced two character witnesses. On cross examination it developed they were basing their estimate of appellant's character on his performance as a laborer on a farm where he had worked seasonally for one or two weeks.

There was no evidence introduced tending in anywise to establish appellant's plea of not guilty by reason of insanity.

The appellant did not testify in the proceedings below.

Counsel for appellant argues that the court erred in admitting the appellant's confession because the corpus delicti had not been established prior to such admission.

We do not agree. Prior to the admission of the confession, evidence had been received tending to show that the appellant, twenty years of age, had joined the much younger children in play. Thereafter Cynthia Marie was missing. Her body was found face down in about a foot of water. There were injuries upon her body of a nature that it could be reasonably inferred were sustained prior to death and were not the result of accident, or natural causes, or suicide.

Circumstantial evidence may afford satisfactory proof of the corpus delicti and where the circumstantial evidence presented supports a reasonable inference that a crime has been committed, a voluntary confession of the crime may be intro-

duced into evidence. Walker v. State, 265 Ala. 233, 90 So.2d 221, and cases therein cited; Snead v. State, 251 Ala. 624, 38 So. 2d 576; Kozlowski v. State, 32 Ala.App. 453, 27 So.2d 811, rev. on other grounds, 248 Ala. 304, 27 So.2d 818.

We have carefully studied this record. The trial court was diligent in protecting the rights of the accused when its rulings were invoked. To write to these rulings would be merely to reiterate elementary principles of law previously stated in numerous decisions, and no useful purpose would be served by such re-statements.

The written refused charges were refused without error in that they were either covered by the court's oral charge, or other charges given at appellant's request, or were abstract, or were affirmative in nature.

The burden was upon the appellant to establish his plea of not guilty by reason of insanity. Section 422, Title 15, Code of Alabama 1940.

The record shows that on 9 May 1963, upon the petition of the attorney for the appellant, the court appointed three physicians named in the petition to examine the appellant to determine whether the appellant "is now insane or whether he was insane at the time of the alleged offense." On that same day each physician filed a certificate to the effect that he had examined the appellant and found him "capable of understanding the nature of the proceeding against him in said cause and of assisting his attorney in defense of said cause against him."

It is to be noted that these certificates are silent as to the appellant's mental condition at the time of the commission of the offense.

This point was not raised at any time in the court below, nor were any of the physicians subpoenaed as witnesses. As before stated, there was no evidence intro-

 

duced in anywise tending to establish appellant's plea of not guilty by reason of insanity. In this state of the record there is nothing before us to review in regard to this point.

The record being free of error probably injurious to any substantial right of the appellant, the judgment is due to be affirmed, and it is so ordered.

Affirmed.

All the Justices concur.