Appellant was convicted of burglary in the first degree and the jury fixed his punishment at imprisonment in the penitentiary for a term of forty-five years. He was represented by court-appointed counsel and at arraignment pleaded not guilty. After sentence was imposed, he gave notice of appeal. He was furnished a free transcript and trial counsel was appointed to represent the appellant on this appeal.
Omitting the formal parts the indictment reads as follows:
 "The grand jury of said county charge that, before the finding of this indictment, and subsequent to June 6, 1935, Willie James Scruggs, alias Cookie, whose name is to the grand jury otherwise unknown, did in the nighttime, with intent to steal, break into and enter the inhabited dwelling house of Gertie M. Howard, which was occupied by Gertie M. Howard, a person lodged therein, against the peace and dignity of the State of Alabama."
There was no request for the affirmative charge, no motion for a new trial, and no exceptions reserved to the oral charge of the Court. At the close of the State's case appellant made a motion to exclude the State's evidence on the ground the State failed to make out a prima facie case against appellant. This motion was overruled and this puts us to a recital of the evidence tending to support the verdict of the jury.
The victim was a 74 year old white woman who was completely and totally deaf. In order to elicit her testimony it was necessary to write questions to be propounded to her by both the prosecution and the defense which questions were read out load for the jury and then handed to the witness to read and state her answers. The Court handed the witness a written oath requesting that she read it and she raised her hand and stated, "I swear that the evidence I give in this case to be the truth, the whole truth, and nothing but the truth, so help me God."
In response to the questions posed to her the witness testified that she was Mrs. Gertie Howard and lived at 3409 Jefferson Avenue, Southwest, in Powderly, Jefferson County, Alabama, and that she had lived at this address for twenty-five or twenty-six years and lived alone. She said that on the night that she was assaulted she had been to church and her pastor brought her home between 9:30 and 10 o'clock. The church had given her some Christmas flowers and she was separating the flowers to put them in some baskets for decoration for Christmas. She had been in her home for twenty, thirty or forty-five minutes when she was suddenly confronted by a black man with a knife in his hand. (The list of exhibits shows it was a butcher knife.) This man grabbed her and jerked her down on the floor. He got on top of her and beat her on her head with the heel of her shoe. He also beat her in the face and scratched her eyes. *Page 838 
She grabbed the hand in which he had the knife and she was weak and bleeding all over. She did not get a good look at him because her eyes were filled with blood. He put his private part into her private parts while she was praying to God to help her. She told him if he wanted money, she didn't have much, but to take it and get out. She asked him not to kill her.
She further testified that her windows and doors were closed and locked, saying, "I had even drove nails in my windows to keep someone from getting in." After he had raped her he grabbed her pocket book and ran out the house. She said she had close to a hundred dollars in it and that it was found later with the money gone.
She managed to call her son who notified the police. She was carried to the hospital for treatment and when asked what injuries she received, said: "My ligament was cut, and, also, this leader across the back of my hand was cut. The finger was dropped down, and my face and head were black all over."
The victim further testified that the last time she saw the knife it was lying on the davenport. She showed it to the police officers and she didn't know what happened to it.
On cross-examination she was asked if the appellant was the man who broke into her house and she replied, "I couldn't be positive, because I couldn't see, because of the blood in my eyes. It looks like him."
On redirect she testified that her son mowed her yard two or three times and a girl from the church came out and mowed it twice. She stated that was the only time it was mowed. She was asked if appellant ever mowed the grass and replied, "I never seen him before. I never saw him until that night."
Mr. George T. Howard, Jr. testified that the victim was his mother and she was 74 years of age; that she lived alone at 3409 Jefferson Avenue, Southwest, in the City limits of Birmingham, Jefferson County, Alabama; that on Thursday night, November 19, 1976, he got a call from his mother at approximately 11:30 or 12 o'clock and she was screaming, "Help, help, I've been ______." He notified the Police Department and left immediately for his mother's home arriving around 12:30 o'clock. When he got to her house he found her on a stretcher and present at that time were two police officers, a fire engine and a paramedic squad. He stated that his mother was "beat up in the face, her eyes were beat shut, and she was bloody all over." He followed her to the hospital where she remained four or five weeks. He said he observed cuts on her head and she had about four lacerations on her hands that required surgery.
He further testified that he observed his mother's clothing before she was carried to the hospital and "the undergarments were torn off her and scattered all over the front room and her dress was just hanging on her; that her blouse was partly torn off one arm." He stated that she could hardly get around, she had a pin in her hip, and she had to get around on one crutch. She broke her hip before the night that she was assaulted and raped and the pin was in her hip at that time. He further stated that he mowed his mother's yard.
Police Officer Lennie M. Sams testified that he was employed by the Birmingham Police Department and had been so employed a little over ten years. He stated that he and his partner, Officer Reese, responded to a call at 3409 Jefferson Avenue, Southwest, on the night of November 18 or the early morning hours of November 19, 1976. He said he had been to this house before and he knew what the problem was when no one answered his knock on the door. The officers looked in the window to see if they could get Mrs. Howard's attention. They could see her in the living room with her flashlight and they got her attention. She came to the front door and let them in the house. Officer Sams described her physical condition in these words: "Physically, she looked like she had been beaten, and there was blood all over her head, ran down into her eyes. Her hands were bleeding and we could observe several cuts on them." They observed blood all *Page 839 
over her clothes, on the floor, and the wall. He said there was a large puddle of blood on the rug in the living room, on the couch and it was splattered all over the wall. There was blood on the telephone, the telephone book, and traces of blood throughout the house.
He further testified that he inspected the premises and in the rear bedroom the glass in the window was broken out and there was glass on the floor beneath the window. He stated there were at least two trunks near the broken window and one was on top of the other and blocked the view of the window to a certain extent. He said these trunks were disarranged as if they had been shoved over to make way to enter the room and they were shoved away from the window; that the top of one of the trunks was leaning over on the side of the bed. He stated that he went outside the house and found the screen which had been torn from the window. It was lying over the fence in the back yard approximately twenty feet from the window. He said he inspected the back door and it was open.
He further stated that the only way he could converse with Mrs. Howard was to write notes to her and she would answer the questions. He said he gave the evidence technician a knife that Mrs. Howard had given him. The knife was covered with blood and hair. At trial he stated that the knife looked like the same one they got that night while in the Howard house, and he gave the knife to the evidence technician. He saw an evidence technician lifting prints from the trunks.
Officer Robert E. Zeanah, an evidence technician with the Birmingham Police Department, testified that he responded to a call and went to Mrs. Howard's home. He arrived at 1:18 a.m. on November 19, 1976. He, too, saw blood on the couch, on a carpet in front of the couch, on the telephone, telephone book and on the wall near the telephone. He stated the telephone book was open. He inspected the house and in the rear bedroom he found the window open and a glass pane broken out. He processed the window for fingerprints, and lifted one print. He processed the trunks in this bedroom and lifted two palm prints from the metal band on one of the trunks, the one that apparently had been moved and was leaning against the bed. He placed these latent prints in a manila envelope, sealed it, and marked it. He took the envelope to City Hall and pushed it through a slot in a locked box.
Zeanah further testified that they designated the lifts as number 126 from the window, number 141 and 143 lifted from the metal band on the trunk. He said that when he deposited the envelope in the lock box at City Hall the lifts were in the same condition as they were when he made the lifts. He stated that after they were placed in the lock box they could not be removed by anyone except the fingerprint technician who had the only key to the box.
Zeanah stated that Officer Sams pointed the knife out to him and he took possession of it. He marked the knife by putting on it the date he got it, the complaint number and his initials and carried it to City Hall. During the trial he identified the knife and it was introduced into evidence over the objection of appellant, as State's Exhibit A.
Police Officer Gasper Chwalek testified that he fingerprinted appellant at the City jail on February 4, 1976. He said that when a person is charged with a felony, fingerprints are made on all fingers and the palms on both hands, and the fingerprint card is then sent to the Identification Bureau where they have fingerprint technicians who classify the prints. He stated that the person whose fingerprints and palm prints are taken is required to sign his name on the fingerprint card. He stated that appellant signed his name on the card, Willie James Scruggs, Sr., in his presence and the officer signed the card also. The palm print of appellant was identified by Officer Chwalek at trial.
Sandy Triplett, a fingerprint technician with the Birmingham Police Department, whose qualifications as a fingerprint expert were not questioned by the defense, testified in detail as to fingerprint characteristics and how they are identified. She *Page 840 
diagramed fingerprint patterns on a blackboard and explained how known prints are compared. She testified that the fingerprint numbered 126, taken from the window of Mrs. Howard's home where the break in occurred did not have sufficient details to make a comparison and identification. She stated that the fingerprint numbered 143 had sufficient detail to make a comparison and it was not made by appellant. However, she said that the palm print numbered 141 was identical with the palm print of appellant. This palm print was lifted from a trunk in the rear bedroom of the home of Mrs. Howard and it had twenty-one points which were identical with the palm print of appellant's known palm print on the card signed by him and taken by Officer Chwalek.
Donna Moore testified that she was a fingerprint technician with the Birmingham Police Department. She, too, qualified as a fingerprint expert. She identified appellant's palm print on file with the lift taken from the trunk in Mrs. Howard's home, and by comparison found them to be identical. She made an enlargement of the print card and this known print card was introduced into evidence. This witness demonstrated her identification procedure by the use of the enlargements for the jury. The enlargements of the known print and the enlargement of the latent lift were introduced into evidence.
Appellant did not testify but offered the testimony of his sister, Wanda Solid, who stated that she lived behind Mrs. Howard on another street. She said that sometimes her brother stayed with her and that in the summer of 1976 her brother cut Mrs. Howard's grass one time. She stated that appellant cut the grass the last part of August.
On cross-examination she said she never saw appellant go inside Mrs. Howard's house though she could see the house from her alley. She further testified that she did not know of the night of the incident involving her brother and she had never seen Mrs. Howard's son cut her grass. She also stated that she did not know Mrs. Howard and had never seen her. She further testified that her brother lived with his mother on Howard Avenue but stayed with her at times. She said she thought he was staying at her house on November 19, 1976.
On rebuttal the State called Sergeant B.R. Stephens and he first testified on voir dire out of the presence and hearing of the jury. According to his testimony he and his partner arrested appellant on November 30, 1976, at 401 Tuscaloosa Avenue which place was the Alcoholism Recovery Center. He said he knew appellant and had known him prior to the day he arrested him. Stephens stated that appellant was arrested around 10:20 in the morning and he told him he was being arrested for nighttime burglary, rape, and robbery and he read him the Miranda rights and warnings. He also testified that he had a conversation with appellant after giving him his Constitutional rights and that prior to this conversation no one in his presence or hearing offered appellant any promises, rewards, remuneration, or inducement of any kind to get him to make a statement. He further testified that prior to appellant making a statement no one in his presence or hearing told him that it would be better or worse for him if he did, or did not, make a statement, and that appellant was not threatened or coerced by the use of force or violence in order to obtain a statement.
From the record:
"Q. What did you say, and what did he say?
 "A. We started off a conversation after we got in the car, en route to the jail. I asked him why he broke in that old lady's house. And he said, `Which old lady?' I said, `Mrs. Howard, down on Jefferson Avenue.'
 "And he said, `Where?' And I said, `3409 Jefferson Avenue.'
"And he said, `I have never been in the house.'"
Appellant's counsel objected to this testimony being given to the jury on the ground that he didn't believe the defendant was fully aware of the circumstances and surroundings in the entire situation he was *Page 841 
faced with at the time this statement was made, five minutes after his arrest, and was not fully aware of all the ramifications and all the . . .
The Court ruled that he would let him testify as to what was said about it and what he was arrested for and the Court further said:
 "I think it is admissible for the purpose which he offered to use it. I think it is more or less a contradiction of what has been said by, perhaps, what the sister testified.
 "She testified he cut the grass over there. It's evidence in relation to the question of fingerprints.
 "I think it is competent, a repudiation of that situation.
 "I will admit it. When the jury comes back in, go through the same process."
When the jury returned to the courtroom, the whole procedure which occurred out of the presence of the jury was repeated. The Miranda rights given the defendant and the proper predicate was laid for the admission of the statement made to Officer Stephens by the defendant were repeated in the presence of the jury.
From the record:
 "Q. Tell the ladies and gentlemen of the jury, as best you can, what you said to the defendant and what the defendant said to you.
 "THE COURT: Let me ask you this first: How long was this after you say you talked to him at the Center?
 "A. Five minutes, time enough to walk out and get in the car.
"THE COURT: Going somewhere?
"A. From there to the City Jail.
 "MR. HYNDS: Judge, at this time, I object to the introduction of that statement, or the testimony as to that statement.
"THE COURT: Overrule the objection.
 "THE WITNESS: En route to the jail, I asked him: `Why did you break in that old lady's house?'
And he said, `I didn't break into her house.'
And I said, `Well, do you know her?'
 And he said, `Yeah. She lives behind my sister,' or something like that.
`My sister lives on Eighth Avenue.'
 And I said, `Well, you stay right behind her, then, don't you?'
 And he said, `No. I just stay there sometimes. I live over on Highland Avenue.'
And I said, `Well, have you ever been in her house?'
And he said, `No, I haven't.'
 And we had some other conversation. I don't recall exactly what.
 "Q. You asked him if he had ever been in her house, and he said no, he hadn't?
"A. Yes, sir."
After the jury began its deliberations they returned to the courtroom to ask the judge a question. We quote from the record:
 "THE COURT: Ladies and gentlemen, did you have some question you wanted to ask?
 "A JUROR: Your Honor, my name is Jonathan Putman, and I was selected as foreman of the jury.
 The question, basically, is if we should find the defendant guilty, we have some question about sentencing.
"THE COURT: About what?
 "THE JUROR: About sentencing. If we should find the defendant guilty and select a number of years as punishment, none of us understand what is involved on parole.
When could the defendant be free on parole?
 "THE COURT: Ladies and gentlemen, that question very often arises with the jurors, and I will go as far as to instruct you, or direct you, about it.
 The question of parole, if there is a conviction in this case, is entirely up to the Board of Pardons and Parole.
 If they see fit to grant parole, it is not in my jurisdiction to say anything about it and to have anything to do with it. It is a matter that is entirely in the charge of that department of the State government, so to speak. *Page 842 
 And if I should tell you what the limitations are about parole, I think I would be committing a reversible error.
 The only issue before you — I must state this — is the question of whether or not he is guilty, and then the question — if you do find him guilty, if you are satisfied from the evidence beyond a reasonable doubt that he is guilty, then it is a question of fixing the punishment.
 The question of parole, or the question of pardon, or anything of that nature, shouldn't enter into it so far as you are concerned.
"A JUROR: Could I ask another question?
"THE COURT: Yes, sir.
 "THE JUROR: Do some sentences carry a limit of parole possibility?
 I have heard comments about a year and a day being different from a year.
 "THE COURT: Well, I — I don't think it is proper that I instruct you relative to that. It might have some influence on your judgment, and I think to do so would be — would not be proper.
 I know what you are asking me, and I can tell you, but I don't think it is within my province to do so.
 "THE JUROR: Well, it is if it is our responsibility to set a penalty, I think we should know the consequences.
 "THE COURT: I'm sorry. I can't give you the consequences. I'm sorry, but that is just the way it is."
Appellant bitterly complains that the State failed to make out a prima facie case against him. We do not agree.
The corpus delicti is a fact, proof of which may be established by circumstantial evidence. Hines v. State,260 Ala. 668, 72 So.2d 296; Taylor v. State, 276 Ala. 232,160 So.2d 641.
If there is a reasonable inference to prove the existence of the corpus delicti the Court should submit to the jury for consideration the question of the sufficiency and weight of the evidence tending to support that inference. Ellis v. State, Ala.Cr.App., 338 So.2d 428; Godfrey v. State, Ala.Cr.App.,333 So.2d 182.
The Court properly submitted the case to the jury. The victim was a 74 year old woman, living alone, who was completely deaf. She returned to her home from church at night between 9:30 and 10 o'clock. Her pastor drove her home from church and after arranging flowers the church had given her she is suddenly confronted by a black man armed with a butcher knife. He grabs her and beats and cuts her unmercifully and rapes her while she is praying to God to help her. The police arrive and find a broken window and a torn and discarded screen. A window pane was broken and glass is found on the inside of the room. Appellant's palm print was found on a trunk inside the house and near the broken window.
Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict; whether there is such evidence is a question of law for the Court, with the weight and probative value for the jury. The rule is that if several crimes in fact constitute one criminal transaction, evidence of all such crimes may be given as part of the res gestae of the offense with which the defendant is charged. Parsons v. State, 251 Ala. 467, 38 So.2d 209; Jackson v. State, 229 Ala. 48, 155 So. 581;Bibb v. State, Ala.Cr.App., 339 So.2d 1108.
Under the principles of law announced in the above cases the evidence concerning the assault upon the victim, the bloody clothing worn by Mrs. Howard and the knife found at the scene of the crime, were all a part of the res gestae of one continuous transaction, or one continuous occurrence, and was properly introduced into evidence.
Appellant contends that the Court erred in its supplemental instructions to the jury with reference to how long an accused must serve a sentence before he may be considered for parole. There are two short answers to this contention: (1) the Court charged the jury that the question of parole, *Page 843 
or the question of pardon, was not to be considered by them, and (2) there was no objection to the supplemental charge. Review on appeal is limited to matters on which rulings are invoked in the trial court. Slinker v. State, Ala.Cr.App.,344 So.2d 1264; Cooper v. State, Ala.Cr.App., 331 So.2d 752.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.