[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1264 
The appellant was indicted under the Alabama Death Penalty Act for attempted robbery when the victim is intentionally killed. This Act is now codified as Section 13-11-2, Code of Alabama 1975. Forty-seven minutes after the jury began their deliberations they found the appellant guilty as charged.
The appellant is represented by court appointed counsel both at trial and on appeal. Application for youthful offender treatment was waived.
The state's evidence was not contradicted. On August 11, 1976, at approximately 3:15 that afternoon, Mrs. Chester L. Brown, her husband, Army recruiter Sergeant Larry D. Moss, and another Army recruiter were present in the Office of the Army Recruiter in Ensley, Alabama. Next door to this office is the Nu-Way Shoe Rebuilders which had been operated by Anthony Joseph Campisi for thirty-eight years. These two offices are immediately adjacent to each other and the only two offices to occupy the building which was owned by Mrs. Brown.
At approximately 3:15 that afternoon these individuals heard a "blast", "explosion", or a "loud noise" just as Mrs. Brown was leaving the recruiting office. Immediately they ran next door to the shoe shop. As Sergeant Moss opened the door to the shoe shop, the appellant came out and said either, "That man in there has been shot in the back", or, "He's in the back". "He's been shot."
The appellant shoved Mrs. Brown aside and ran down the street. He was wearing a green Army fatigue jacket bearing the name of "Jones" and a black cap. Sergeant Moss entered the store and found Mr. Campisi holding his chest "beginning to go down saying `help me'". The Sergeant then ran to the nearby police station.
The appellant was seen running through traffic within a block of the shoe store. Portia Mahoney identified him and testified that he had a gun hanging under his jacket because she could see the handle protruding from underneath his jacket. She stated that this handle was too large for a pistol. She saw the appellant run up in front of a blue automobile parked in an alley, get "under it in some kind of way" and "fumble around up under there".
Michelle Turner, Ms. Mahoney's cousin, corroborated this testimony to the extent that she saw a male running across the street and noticed the handle of a gun under his jacket. However she could not identify the man as the appellant.
Ms. Mahoney told a police officer what she had seen. Birmingham Police Officer J.L. Sumner proceeded to the alley. Under a parked car he found a sawed-off shotgun and an Army fatigue jacket with the name "Jones" on it. A black leather cap was also discovered.
The appellant's fingerprints were found on the front door of the shoe shop. Investigating officers found the cash register closed. It contained seventeen dollars and eighty cents. Seven dollars and ninety-five cents in loose change and rolls of pennies were found next to and on a shelf underneath the cash register. A total of twenty-five dollars and seventy-five cents was found in the store.
Expert testimony revealed that Mr. Campisi was shot with a shotgun in the back area of the left shoulder. This caused massive hemorrhage which resulted in his death. The "shot piston" and the wadding from the shotgun shell were found in the wound. *Page 1265 
The appellant was arrested around 6:15 or 6:30 P.M. on the evening of August 12, 1976, at a residence in Pratt City. He was advised of his constitutional rights and transported to City Hall. At 7:40 P.M. the appellant confessed to the shooting. This concluded the evidence presented by the state.
The thrust of the defense was that the appellant was mentally retarded and, for that reason, incapable of a knowing and intelligent waiver of his constitutional rights and therefore unable to give a voluntary confession.
Dr. Allen Shealy is a clinical psychologist. He was serving as Chief of the Psychology Service of the Veteran's Hospital in Birmingham and Associate Professor in Clinical Psychology at the University of Alabama in Birmingham Medical School. On January 14, 1977, he spent "a little better than two hours" with the appellant. During this time, Dr. Shealy conducted a psychological evaluation of the appellant which consisted of an interview as well as the administration of the Wechsler Adult Intelligence Scale test, the Graham-Kimbrell Memory for Designs test to screen out any kind of gross neurological problems for brain damage and a test to measure emotional stability adjustment called the Rorschach Inkblot test.
Dr. Shealy determined the appellant to have an I.Q. of 69 and a mental age of twelve years and five months. He found the appellant to be within the diagnostic range of mentally retarded — within that level of mental retardation described as borderline.
The tests administered by Dr. Shealy revealed that the appellant did very poorly on his ability to think abstractly. The appellant was below normal in comprehensive ability.
Dr. Shealy stated that a person with an I.Q. of 69 would have difficulty understanding abstract terms in general. He testified that he did not believe that the appellant would understand the word "waiver", the phrase "you have the right to remain silent", doubted that he understood the concept of lawyer being appointed and the concept of legal rights. A person with an I.Q. of 69 would be susceptible to coercion and persuasion.
The doctor testified that the appellant would not understand the Miranda warning but would understand the questions asked him in his confession.
According to Dr. Shealy the appellant is not psychotic. He did not determine the emotional age of the appellant. He felt that the appellant did the best he could on the tests and did not "fake".
The father of the appellant testified that the appellant was born on December 28, 1959. No certificate of birth was ever obtained. With this evidence, the defense rested. I
Initially the appellant contends that the imposition of the death penalty in this particular action constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution.
The Supreme Court of the United States has held that the death penalty does not per se violate the Eighth Amendment and is not in and of itself cruel and unusual punishment. Gregg v. Georgia,428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). This court initially upheld the constitutionality of the death penalty as imposed by statute in Alabama in Jacobs v. State, 6 Div. 389,361 So.2d 607 (Ala.Cr.App. 1977). Subsequent decisions have affirmed this position.
By Section 13-11-5, Code of Alabama 1975, the judgment of conviction and sentence of death are subject to automatic review. Exercising this right we are convinced that the imposition of the death penalty in this particular case does not constitute cruel and unusual punishment nor was it imposed in an unconstitutional manner.
At a hearing held to determine whether the court would sentence the appellant to death or to life imprisonment without parole the trial court heard evidence on the *Page 1266 
aggravating and mitigating circumstances surrounding the crime.
The state and the defense stipulated that on April 27, 1976, the appellant robbed a U-Totem store in Ensley, Alabama, and shot James B. Hutchinson during the process. Mr. Hutchinson survived. The appellant was convicted and sentenced to life imprisonment.
It was also stipulated that on August 10, 1976, the appellant shot, with a shotgun, and killed a taxicab driver, Raymond Lewis Bard, in the city of Birmingham; that the confession given on August 13, 1976, by the appellant was a true statement and an admission by the appellant that he shot and killed Mr. Bard.
It was further stipulated that Dr. Allen Shealy, if called, would give the same testimony he did during the trial.
At the hearing the state called Braxton Eugene Baker, Principal of Vincent High School, Shelby County, Alabama, who produced the elementary and high school records of the appellant. These records reveal that the appellant was a very poor student whose attendance was also very poor. The highest grade level attended by the appellant was one semester in grade nine.
The father of the appellant, Lorenzo Watters, stated that, when the appellant was young, he had to take him to the hospital for some kind of "spell" or "fit" which he characterized as "epilepsy fits". Although his son "had them fits a lots" he only took him to the hospital twice because he was poor. The appellant had a "hard one" (fit) in 1972.
After hearing this testimony and receiving the stipulations, the trial judge stated his finding of facts.
 "If this were the only time this Defendant had committed this offense, I can't say for sure, but I would say that I would carefully consider commuting this sentence to life without parole. But the Defendant, for whatever reason, and I can't look into his mind, has demonstrated that he is — you may sympathize and I do with him and his family and his station in life — totally devoid of human emotion. Reading this statement that I have just read in the Bard case[1] totally convinces me of that. He shot Mr. Bard one time with the sawed-off shotgun, and then he reloaded it and shot him again. Totally devoid of human compassion or understanding. I think that the mitigating factors in this case, I don't think, and I had read these closely, that the Legislature put in there Intelligence Quota.
* * * * * *
 ". . . (T)he Defendant at the time of the commission of this offense was 17 years old and his — he is now 18 at this date, and I consider that as a mitigating circumstance. I consider 17 a mitigating circumstance.
 "All the others they're (the Legislature) talking about, they're not talking about intelligence. They're talking about extreme duress under the substantial domination of another person. That's not an issue here.
 "Capacity of the Defendant to appreciate the criminality of his conduct. I think unquestionably that he does, and anybody who reads this statement would understand that he does.
 "Another one, the capital felony was committed while the Defendant was under the influence of extreme mental or emotional disturbance. I don't think so. Dr. Shealy's testimony specifically contradicts that.
 "He has a significant history of prior criminal activity. The robbery case that I tried where Mr. Hutchinson was shot point blank with a .38 pistol. I forget the date, but it was not a weekend spree. I think that case was three or four months prior to it. Then killing Mr. Bard on one day, and then the next day after he had killed the man by shooting him twice, reloading a sawed-off shotgun, he went *Page 1267 
out to the store in this case we just tried, Mr. Campisi's, to take his money, and then shot him in the back with a shotgun. To me all those factors plus Section 6, Subsection (d) was committed while the Defendant was engaged or was an accomplice in the commission of an attempt to commit a robbery in this case which indicates to me, and, of course, that's what he's tried for, which indicates to me that Subsection (f) of Section 6, which is aggravating circumstances, says that capital felony was committed for pecuniary gain. To me that indicates what the Legislature thinks these particular crimes of intentionally killing the victim of a rape, or robbery, nighttime burglary, kidnapping for ransom. Some of those type crimes are considered more appropriate for the death penalty than possibly some of the others in this section. That's the only way I can read it. That plus his significant history of just brutal, wanton killing tells me that this sentence is due and hereby upheld."
We can add nothing to the findings made by the trial judge. Under these circumstances we do not think the imposition of the death penalty constitutes cruel and unusual punishment. The sentence was reached in accordance with the constitutional provisions of due process as previously defined by this court.
 II
The appellant contends that the admission of his confession into evidence was error to reverse because the material facts indicate that the waiver of constitutional rights was involuntary.
 "When taken in its most simple fashion, the material facts are readily apparent. A minor Negro, uneducated, mentally retarded, unable to read, and without the advice of counsel, was isolated in a hostile environment, interrogated by his arrestor, and coerced by deceptively friendly inquiries of the chief enforcement officer for a city of 800,000 souls."
Brief of Appellant, p. 21.
The appellant, though a minor, is not a juvenile. At trial there was some conflict as to whether the appellant was born in 1957 or 1958. Regardless of the year of his birth, the appellant was over sixteen when the crime was committed. Title 13, Section 350, Code of Alabama 1940. Since the crime occurred before January 16, 1977, Section 12-15-67, Code of Alabama 1975, relating to the confessions of children, is not applicable.Parker v. State, Ala.Cr.App., 351 So.2d 927, cert. quashed, Ala.,351 So.2d 938 (1977); Ex parte Bolden, 358 So.2d 795 (Ala. 1978).
In Parker, supra, this court adopted the totality of the circumstances test in determining the voluntariness of a minor's waiver confession. Examining the circumstances of this case we find the conduct of the involved officers and chief of the Birmingham Police Department to be beyond reproach.
On the day after the murder, the appellant was found hiding behind a dresser in a residence after officers of the Birmingham Police Department had been given consent to search the house. Three to five officers were present when the appellant was discovered and arrested. The appellant was handcuffed and advised of his Miranda rights by Sergeant T.B. White in that same room where he was found. The appellant stated that he understood these rights. At this time the case was not discussed. The lady who gave consent to search the house, who was never identified, did not request to go with the appellant. She did ask when he would be back. James C. Parsons, Chief of the Birmingham Police Department, who was present when the appellant was arrested, told her that they were taking the appellant uptown to fingerprint and talk to him. He told her that he would contact her later and let her know if they were going to book him or not.
Chief Parsons introduced himself to the appellant and told him that they were going to take him "uptown" and that no one was going to bother him. Parsons then drove the appellant and Sergeant White to City Hall. This took about five or ten minutes. *Page 1268 
In the car, Sergeant White again advised the appellant of his rights and questioned him about the case. The appellant denied having any knowledge of the crime. White stated that he did not question the appellant continuously during the ride and did not remember Chief Parsons asking any questions. Parsons testified that he did not remember the appellant being questioned in the car — "the only discussion was that we were not going to talk to him in the car, if my memory serves me right".
At City Hall the appellant was taken to the Identification Bureau where he was fingerprinted and processed. The appellant was not questioned during this time. Chief Parsons testified that he first heard the appellant being advised of his rights when he informed Sergeant White that "it was a positive print". At that time White informed the appellant of his rights.
The appellant was then taken directly to Chief Parsons' office. Parsons asked the appellant if he remembered Sergeant White giving him his rights and if he understood those rights. The appellant stated that he did in response to both questions. Parsons then told the appellant that he wanted to discuss the killing of a shoe merchant in Ensley. The appellant said, "Yes, I know". Chief Parsons then asked the appellant if he shot him and the appellant replied that he did. At this time the appellant also admitted killing a cab driver the day before he shot Mr. Campisi. This questioning lasted about two or three minutes. The appellant was taken to the interrogation room where he was questioned by Lieutenant Alton W. Pattman and Sergeant Ballard about the murder of the taxicab driver.
Lieutenant Pattman talked with the appellant about the murder of the taxicab driver and the shooting of Mr. Campisi. Initially the appellant denied any knowledge of anything. However, after Pattman told the appellant that "we had fingerprints on the case" and that he must know something about it, he had to be there, the appellant then admitted that he shot the cab driver. The appellant did not tell Pattman and Ballard about the Campisi murder. The appellant was not accused of lying and no one told him that he did not believe him.
After this, Ballard and Pattman went outside the interrogation room and Chief Parsons went in for "a couple of minutes". Parsons told the officers to stay with the appellant until Sergeant White arrived.
When Sergeant White arrived he notified Sergeant B.R. Stephens, who talked with the appellant for thirty or forty minutes about the murder of the cab driver. Although the appellant was nervous, he was not very nervous. He did not cry and was not upset. Sergeant Stephens testified that he advised the appellant of hisMiranda rights.
When Sergeant White began to question the appellant, the appellant admitted the killing in the Campisi case but denied killing the cab driver. White came out of the interrogation room and informed Chief Parsons, who then went into the room with the appellant. Parsons asked the appellant about the discrepancy between what he had admitted in his office and what he had just said to Sergeant White. The appellant responded that "he didn't want to confess to both of them, because it would mean that he would have to go to jail for a long time". Parsons then said, "Well, we have to have the truth". The appellant said, "All right. Send Sergeant White back in." This was the extent of the conversation. Parsons stated that he did not tell the appellant that it would be better for him to tell the truth.
Sergeant White resumed questioning the appellant and took his statement in the Campisi murder. The statement was taken at 7:24 P.M., approximately one hour after the appellant was arrested. The tape recorded statement of the appellant was transcribed the following day and Sergeant White read it twice to the appellant who stated that it was true and correct and signed it. At some point before the statement was taken, the appellant told Sergeant White that he could not read. Sergeant White stated that at that time he again advised the appellant of his rights. White read the appellant his rights "not rapidly, slowly enough for where I felt like *Page 1269 
— . . . (he) could understand". White testified that he did not remember the appellant crying at any time or see him get upset. He also stated that the appellant did not request to see anyone.
There are no allegations of police misconduct in securing the confession. However the appellant contends that his waiver of constitutional rights and confession were involuntary because he is mentally retarded, unable to comprehend abstract terms, has an I.Q. of 69, and is susceptible to coercion and persuasion.
 "The issue raised by the appellant has previously been answered by the Alabama Supreme Court in Elrod v. State, 281 Ala. 331, 202 So.2d 539 (1967). While the accused's intelligence, character, and situation at the time of the confession are important considerations in determining whether that confession was voluntary, the fact that the accused was of tender age or weak intellect will not alone render the confession inadmissible in evidence as involuntary, Elrod, supra; or where the accused was of weak mentality, feeble-minded, under mental stress or an illiterate, Elrod, supra; or was not in full possession of his mental faculties, Lokos v. State, 278 Ala. 586, 179 So.2d 714, vacated in 408 U.S. 935, 92 S.Ct. 2854, 33 L.Ed.2d 749, on remand, 290 Ala. 122, 274 So.2d 303 (1965); or that the accused was an `ignorant' man, Porter v. State, 55 Ala. 95 (1876).
 "A confession of crime is not inadmissible merely because the accused, who was not insane, was of less than normal intelligence. Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246, rehearing denied, 352 U.S. 1019, 77 S.Ct. 553, 1 L.Ed.2d 561 (1957) (accused left school at age 16 while still in the third grade; his mother testified that he had always been `thickheaded'; the court, commented that he was `certainly of low mentality, if not mentally ill'); Hoober v. State, 81 Ala. 51, 1 So. 574 (1886) (accused was a person of `weak mental capacity'); Peck v. State, 147 Ala. 100, 41 So. 759 (1906) (a `weakminded' person). Generally, see Annotation: mental subnormality of accused as affecting voluntariness or admissibility of confession. 69 A.L.R.2d 348. Thus while the fact that a confession was made by an illiterate or one with below normal intelligence is to be taken into consideration and viewed as a factor indicating that the confession was lacking in voluntariness, a confession is not inadmissible merely because the accused was of less than normal intelligence." Arnold v. State, Ala.Cr.App., 348 So.2d 1092, 1096, cert. denied, Ala., 348 So.2d 1097 (1977).
The state presented evidence that the appellant was never threatened, accused, intimidated, coerced, or forced to confess. No hope of reward or offer of leniency of any kind was ever proffered the appellant. The appellant was advised of his Miranda
rights on at least four separate occasions. He stated that he wished to waive these rights and acknowledged that he understood them. From the appellant's statement that "he didn't want to confess to both of them, because it would mean that he would have to go to jail for a long time" it is apparent that he was aware of his situation and conscious of the consequences an admission would produce. He never repudiated his confession but acknowledged its correctness the day after it was made. Of significance is the last question and answer of that confession.
 "Q. Is it a true statement to the best of your knowledge?
 "A. It's a true statement, and 'um telling you from my heart what happened. You know, any other person would try to lie probably, but 'um telling you the truth, this the truth. You know, not too many people got enough heart to say they shot somebody. I ain't got the heart to say it but, I couldn't live with it, I couldn't live with it, so I might as well tell."
In support of the involuntariness of the waiver and confession, the testimony of Dr. Shealy depicts the appellant as a mentally retarded individual of low I.Q. anxious to cooperate in his susceptibility to authority and unable to comprehend the Miranda *Page 1270 
warnings and the import of his constitutional rights.
Despite the testimony of the psychologist, the evidence supports a finding that the appellant voluntarily confessed to the murder of Mr. Campisi. Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting an inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge that the confession was voluntary need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, Ala.Cr.App.,347 So.2d 1371, cert. denied, Ala., 347 So.2d 1377 (1977). When such a conflict occurs, great weight must be given to the judgment of the trial judge. His finding will not be disturbed on appeal unless the conclusion of voluntariness is contrary to the weight of the evidence or unless manifestly wrong. Harris v. State,280 Ala. 468, 195 So.2d 521 (1967); Elrod v. State, 281 Ala. 331,202 So.2d 539 (1967); Smith v. State, Ala.Cr.App., 340 So.2d 889, cert. denied, Ala., 340 So.2d 895 (1976).
Under the facts and circumstances of this case we would be presumptive were we to hold that the appellant's confession was involuntary, as a matter of law, because of his mental subnormality.
 III
The appellant contends that the State of Alabama has improperly discriminated against him and other members of his class of mentally retarded criminal defendants in violation of his right to equal protection under the Fourteenth Amendment to the United States Constitution.
Insanity is a defense in a criminal case. However, neither mental abnormality nor subnormality constitutes an excuse for a criminal act. Neither precludes liability for crime where there exists the sufficient mental capacity to entertain the requisite criminal intent. Lee v. State, 265 Ala. 623, 93 So.2d 757 (1957). Illiteracy is also no defense or excuse. Elrod, supra.
 "The strength of a man's mind has no bearing upon his responsibility for a criminal act, nor upon the inquiry of felonious intent, malice, and the like, if he is endowed with mind enough to discriminate between right and wrong; and the fact that he may, in common parlance, be of weak mind, standing alone, does not go to negative such discriminating intelligence." Dean v. State, 105 Ala. 21, 24, 17 So. 28, 29 (1894).
* * * * * *
 "(C)riminal incapacity is not established by a mere showing of weakness of intellect, a low order of intellect, susceptibility to suggestion, or a subnormal mentality. Neither is it sufficient to show that defendant is more ignorant and more stupid than common men, or is an illiterate, ignorant and passionate man." Perkins, Criminal Law, pp. 878-879 (2nd ed. 1969).
* * * * * *
 "Most courts have agreed that a defense of mental retardation is not acceptable unless the defendant, by reason of his condition, is unable to differentiate between right and wrong regarding the act in question." 8 Creighton Law Review 622, 646 (1975), The Mentally Retarded Offender In Omaha — Douglas County.
Any modification of the rule as to the defense of insanity is a prerogative of the Legislature and not of the courts. Clayton v.State, 45 Ala. App. 127, 131, 226 So.2d 671 (1969).
In Alabama, by statute, all persons over fourteen years of age are presumed to be responsible for their acts. Section 15-16-2, Code of Alabama 1975. This presumption is not contrary to due process under the Fourteenth Amendment. Hutchens v. State,45 Ala. App. 507, 232 So.2d 687 (1970); Patterson v. New York,432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). The statute is constitutional and does not invade "any constitutional right of the defendant in imposing upon him the burden of proving the plea of insanity". Martin v. State, 119 Ala. 1, 25 So. 255 (1898). *Page 1271 
 "That legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law, it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under the guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed." Ex parte Woodward, 181 Ala. 97, 101, 61 So. 295 (1913).
Because sanity is the normal condition of the human mind, the prosecution may proceed, in the first instance, upon the presumption that the defendant was sane and responsible when the act was committed. Davis v. United States, 160 U.S. 469,16 S.Ct. 353, 40 L.Ed. 499 (1895).
The facts of this case do not support the appellant's contention that the Alabama Death Penalty Act denies him equal protection of the laws.
 IV
The appellant contends that the trial court committed reversible error by admitting into evidence a photograph of the deceased made by the coroner at a time before the autopsy began, "mainly to show the face of Mr. Campisi to use for identification".
Although the appellant alleges that the photograph shows "evidence of incisions made during autopsy, not alleged to have been inflicted by the appellant", the actual photograph does not support such a statement. The coroner testified that he took the picture "at a time before the autopsy began".
Photographs of the deceased are admissible as evidence, being proper aids to identification. Malachi v. State, 89 Ala. 134,8 So. 104 (1889).
 "This rule's observance is not affected, one way or the other, by the fact that there is in the evidence given by the witness or witnesses no actual dispute as to the identity of the body of the deceased." Sanders v. State, 202 Ala. 37, 79 So. 375 (1918).
See also Burleson v. State, 52 Ala. App. 399, 293 So.2d 317
(1974); Luschen v. State, 51 Ala. App. 255, 284 So.2d 282 (1973);Boulden v. State, 278 Ala. 437, 179 So.2d 20 (1965); Burgess v.State, Ala.Cr.App., 339 So.2d 121 (1976); Gilmore v. State, Ala.Cr.App., 346 So.2d 1193 (1977).
The photograph was not gruesome and would not tend to arouse passion or prejudice the jury. The trial court properly admitted the picture into evidence.
 V
The final argument of the appellant is that, but for the confession of the accused, the state failed to prove the corpus delicti of the attempted robbery as charged in the indictment. It is contended that under the Alabama Death Penalty Statute various "aggravated" crimes are defined. In this case the state was required to show the requisite elements of an intentional killing committed in an attempt to perpetrate a robbery. The appellant argues that the only evidence of any attempted robbery was supplied by the confession. Because the state did not introduce independent, probative evidence to corroborate the appellant's admission of the attempted robbery, the evidence is insufficient to support a conviction.
It is a settled principle of law that a mere extrajudicial confession, uncorroborated by other facts, is insufficient to show the corpus delicti and cannot support a conviction. Matthewsv. State, 55 Ala. 187, 28 Am.Rep. 698 (1876); Reynolds v. State, Ala.Cr.App., 346 So.2d 979, cert. denied, Ala., 346 So.2d 986
(1977). However, it is equally as settled that inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable *Page 1272 
doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti. Hill v. State,207 Ala. 444, 93 So. 460 (1922); Bryant v. State, 33 Ala. App. 346, 33 So.2d 402 (1948).
Circumstantial evidence may afford satisfactory proof of the corpus delicti. The presentation of facts, from which the jury may reasonably infer that the crime charged was committed, requires the submission of such question to the jury. Johnson v.State, 247 Ala. 271, 24 So.2d 17 (1946); Taylor v. State,276 Ala. 232, 160 So.2d 641 (1964). Reasonable inferences may furnish a basis for proof beyond a reasonable doubt. Royals v. State,36 Ala. App. 11, 56 So.2d 363, cert. denied, 256 Ala. 390,56 So.2d 368 (1952).
The facts in this case and the legal inferences springing from them fully support and corroborate the appellant's confession. The evidence is therefore sufficient to support a conviction.
A review of the complete record convinces us that the appellant received a fair trial. We find no errors adverse and prejudicial to his substantial rights. His representation by court appointed counsel both at trial and on appeal is in accord with the highest standards of the legal profession. While this court is cognizant of the gravity and consequence of affirming a judgment sentencing a minor to death, the appellant's actions display a malevolence and corruption well beyond his physical age. Under the law the sentence is authorized; under the facts the punishment warranted. The evidence of the appellant's guilt is overwhelming and beyond all reasonable doubt. Therefore the judgment of the trial court is affirmed.
AFFIRMED.
All Judges concur.
[1] The appellant confessed to the killing of Mr. Bard, the taxicab driver, at the same time he gave his confession in this case.